# EXHIBIT B

# EXHIBIT B

MICHAEL K. JEANES
Clerk of the Superior Court
By Dorotha Stephens, Deputy
Date 09/09/2010 Time 16:25:54

| Description | Amount |
|---|---|
| ——— CASE# CV2010-053113 ——— | |
| CIVIL NEW COMPLAINT | 301.00 |
| | |
| TOTAL AMOUNT | 301.00 |

Receipt# 20825892

**Name of Person Filing: <u>Jay Boersma</u>**
**Your Address: <u>15324 E Sundown Drive</u>**
**Your City, State, Zip Code: <u>Fountain Hills, Arizona 85268</u>**
**Your Telephone Number: 480 816 4246**

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR MARICOPA COUNTY

Jay Boersma

                Plaintiff,

vs.

M&I Marshall & Ilsley Bank et al

                Defendant.

COMPLAINT FOR (1) FRAUDULENT MISREPRESENTATION;
(2) PREDATORY LENDING PRACTICES;
(3) QUIET TITLE

CV2010-053113

Plaintiff hereby reserves the right to amend this complaint if and when Plaintiff learns more facts and/or issues in regards to the actions or in-actions of the Defendants.

**GENERAL ALLEGATIONS AS TO ALL CAUSES OF ACTION (AS TO ALL DEFENDANTS):**

1.    At all times herein mentioned, Plaintiff, Jay Boersma, was and is residing in the County of Maricopa and is the owner in possession of property and family home located at 15324 E Sundown Dr, Fountain Hills community, Arizona, State of the Republic. (hereinafter "the subject property.")

2.    Defendants, M&I Bank, is the purported holder of a First Deed of Trust secured against the subject real property that assertedly is supported by a promissory note executed by Plaintiff.

3.Plaintiff is in anticipation of the beginning of foreclosure action as he is now 2 months behind on payments. The subject property owned by Plaintiff is unique, and therefore, should Defendants, and each of them, not be enjoined from action against Plaintiff's property, Plaintiff will suffer irreparable injury for which there is no adequate remedy in law when Defendants proceed to sell the subject property at foreclosure sale.

9.    In all of the wrongful acts alleged in this Complaint, the Defendants, and each of them, have utilized the United States mail in furtherance of their conspiracy to both unlawfully collect on negotiable instruments when they are not entitled under law to do so, and, assuming arguendo they do have the right to proceed to foreclosure under the note, to profit from those actions and amounts

greater than their rights under the note to do so.

10.    Defendants, and each of them, in committing the acts alleged in this and in other cases are engaging in a pattern of unlawful activity.

11.    As a result thereof, Plaintiff has been damaged in having to bring this action to enjoin the impending non-judicial foreclosure of the subject real property.

**FIRST CAUSE OF ACTION FOR FRAUDULENT MISREPRESENTATION AS TO ALL DEFENDANTS**

12.    Plaintiff repeats and incorporates by reference the allegations appearing in paragraphs 1 to 11 of this Complaint as though set forth herein.

13.    Defendants, and each of them, have represented that they have their right to payment under a note and further have the right to conduct a non-judicial foreclosure sale.

14.    However, Plaintiff is informed and believes, and thereupon alleges, that the true facts are that Defendants are not and were not in possession of a note secured by the subject property, nor are they holders of a note entitled to payment as those items are used in the Uniform Commercial Code **AZ Code 47**-3301, 3009, and otherwise, and therefore, the Defendants, and each of them, are and were proceeding to claim payment without a note secured by the subject property, and thus, without right under law.   Further, Plaintiff is informed and believes, and thereupon alleges, that the Defendants, and each of them, added costs and charges to the payoff of the note that were not justified and proper under the terms of the note or the law.

15.    Plaintiff is informed and believes, and thereupon alleges, that Defendants, and each of them, misrepresented the facts when they have represented that they have the right to foreclose on the subject property belonging to Plaintiff, when in fact they did not have the lawful right, and intended to either force Plaintiff to pay large sums of money to Defendants, and each of them, to which they were not entitled under law, or to abandon the subject property to Defendants by not resisting the proposed foreclosure sale.

**MEMORANDUM OF FACT AND LAW IN SUPPORT**

1.    **Whether any parties for whom  M&I Marshall & Ilsley Bank is acting is holder in due course of the original, unconverted, debt instruments who would have personal jurisdiction and standing as legal holders of the debt to exercise this contract in their own name** or whether such note/contract between M&I Marshall & Ilsley Bank and   Plaintiff survives today has not been established by the defendants **by affidavit or other competent fact witness.**

2.    Based on the information provided in the affidavits, excerpts from a Prospectus for a CWABS ASSET-BACKED CERTIFICATES TRUST, ABCT attached, which is factual

documentation of the uses made of other actual mortgage debt instruments in the banking industry, and which shows there are dozens of such Asset Backed Pools or Trusts named contracted with that trustee and mortgage servicer alone. And between these the note may be traded numerous times after that. The prospectus shows in all of these, actual **possession and legal title** has to be transferred to the individual Asset Backed Pool or Trust for the investment vehicle to be legal. Such that claimant **could not** have still owned the instrument while it belonged to one of these others if it did. Making the question as to the legal holder of the debt whose rights to the contract would be represented by a claim is a material issue in this case.

3.    From the Securities and Exchange Commission, Release nos. 33-6518; 34-50905; File No. S7-21-04, RIN 3235-AF74 ASSET BACKED SECURITIES; Final Rule; request for comment, (relevant portions herein attached ABS) we find on pages 10 and 11 under the heading **"Overview A. What are Asset-Backed Securities?" ....In a basic securitization structure, an entity, ...known as a sponsor, originates or otherwise acquires a pool of financial assets....It then sells the financial assets.....to a specifically created investment vehicle that issues securities "backed" or supported by those financial assets....." "The ABS market....has rapidly become an important part of the U.S. capital markets. One source estimates 2003 new issuance close to $800 billion." The footnote to this (30) states, "The four primary asset classes currently securitized are residential mortgages, automobile receivables, credit card receivables and student loans, which represent approximately 52%, 19%, 16% and 9% of 2003 new issuance, respectively." This being the case, that means as far back as 2003, 416 billion dollars in mortgage loan receivables** accounted for 52% of this total **Asset-Backed Securities** market, and as indicated, such market has grown each year since the creation and use of such financial vehicles began in about 1990 at 46.8 billion dollars, which gives rise to reasonable suspicion this mortgage loan account may have been part of such an **Asset-Backed Securities** pool, and if so, as indicated it would have been sold to and owned by the **"specifically created investment vehicle that issues securities "backed" or supported by those financial assets....."** and, as we have stated, could not then or now be actually held or owned by the claimant if it is still in such an **Asset-Backed Securities** pool. Defendant's claim offers no affirmation that the debt instruments can actually be produced to evidence this is not the case or to support their affirmation they are holders of it to support Defendant's standing to bring this claim.

4.    On the basis of such documented practices Plaintiff here asserts the debt instruments i.e. note and deed of trust that are the subject of the contract in question, may have been sold to be part of such a folio of commercial paper of Asset Backed Certificates or Trusts in which the original legal debt instruments of this contract are being held or have been repurchased from such Asset Backed Certificates or Trusts as:

3

ALTERNATIVE LOAN TRUST,

Alternative Loan Trust,

CHL MORTGAGE PASS - THROUGH TRUST,

CHL Mortgage Pass-Through Trust,

CWABS ASSET-BACKED CERTIFICATES TRUST,

CWABS Asset-Backed Certificates Trust,

CWABS INC ASSET BACKED CERTIFICATES,

CWABS INC Asset-Backed Certificates,

CWALT INC - ALTERNATIVE LOAN TRUST,

CWALT, Inc. Alternative Loan Trust,

CWALT Inc Mortgage Pass-Through Certi,

CWHEQ Home Equity Loan Trust,

CWMBS INC - CHL MORTGAGE PASS-THROUGH,

CWMBS, INC. - CHL Mortgage Pass-Through, **or other folios of commercial paper in which the note and/or mortgage from this loan is or was being held in Asset Backed Certificates or Trusts of other titles not designated here;**

**OR,** these sources show In other cases, as may be shown from discovery, the loan has been sold into something called a **Master Trust or SPV (Special Purpose Vehicle)** for which Defendant, or a prior purchaser or maker of the loan has retained possession of the instruments of indebtedness, as will be shown by evidence produced from discovery of RECENT 8K FILINGS as required under the Securities Acts of the UNITED STATES of that entity with which my note is or was held in such Asset Backed Certificates or Trusts and by copies of the Pooling and Servicing agreement under which it is or was held and other documentation which may exist showing the Issuing Entity acting as managing underwriter or Depositor, the Seller and Sponsor, Master Servicer, Trustee, Originator, NIM Insurer, and the Cut-off and Closing Date of such arrangements that will verify the fact my instruments of indebtedness have been sold and may be held or have been repurchased from such Asset Pool or Trust by the Defendant, or a prior purchaser or maker of the loan.

    5.    In such case the loan may have **been** legally sold many times but the Defendant, or the original lender has **retained possession of the actual instruments** and there is nothing on the note **or** deed of trust marking this.

    6.    After some other bank conglomerate tells me they are the servicer or holder, these documents show it may legally be negotiated a dozen or more times even when they are supposed to officially have it. And therefore, whether the identified actual party in interest for these debts legally had title to the notes in question at the time this action was brought or their claim would be

made is a material fact clearly in question. And unless further evidence is produced to support the standing of the Creditor to bring the claim, such question of the claimant's standing will be a material fact in dispute that must be resolved factually before their claim can be accepted.

7.     **As well as may again be established by competent fact witness of these debt instruments themselves, also demanded in this case and to be demanded in discovery here showing** markings on it or an allonge attached or reduced to computer disc showing that exchange, sale or transfer of the loan has been made by one or more of the holders of these instruments since the making of the loan and who actually is now the present legal and actual holder of these debts with standing to foreclose in its name.

8.     Or as federal law we have cited shows, it may even now be owned by a GSE **(government sponsored enterprise)** being anyone of numerous Federal Mortgage Associations the government provides to purchase mortgage loans and provide stability to the housing industry and in each case it may not really belong to the claimants at all.
Pursuant to:

**2 USC § 622. Definitions**

**(8)** The term **"government-sponsored enterprise"** means a corporate entity created by a law of the United States that—
**(A)**
**(i)** has a Federal charter authorized by law;
**(ii)** is privately owned, as evidenced by capital stock owned by private entities or individuals;
**(iii)** is under the direction of a board of directors, a majority of which is elected by private owners;
**(iv)** is a financial institution with power to—
**(I)** make loans or loan guarantees for limited purposes such as to provide credit for specific borrowers or one sector; and
**(II)** raise funds by borrowing (which does not carry the full faith and credit of the Federal Government) or to guarantee the debt of others in unlimited amounts; and

And pursuant to

**TITLE 12 > CHAPTER 13 > SUBCHAPTER III > § 1717**          Prev   |
Next

**§ 1717. Federal National Mortgage Association and Government National Mortgage Association**

**(a) Creation; succession; principal and other offices**
**(1)** There is created a body corporate to be known as the "Federal National Mortgage Association", which shall be in the Department of Housing and Urban Development. The Association shall have succession until dissolved by Act of Congress. It shall maintain its principal office in the District of Columbia and shall be deemed, for purposes of venue in civil actions, to be a resident thereof. Agencies or offices may

be established by the Association in such other place or places as it may deem necessary or appropriate in the conduct of its business.

**(b) Purchase and sale of insured and conventional mortgages; transactions in loans and advances of credit**

For the purposes set forth in section 1716 of this title and subject to the limitations and restrictions of this subchapter, each of the bodies corporate named in subsection (a)(2) of this section is authorized pursuant to commitments or otherwise, to purchase, service, sell, or otherwise deal in any mortgages which are insured under this chapter or title V of the Housing Act of 1949 [42 U.S.C. 1471 et seq.],

**(2)** For the purposes set forth in section 1716 (a) of this title, the corporation is authorized, pursuant to commitments or otherwise, to purchase, service, sell, lend on the security of, or otherwise deal in mortgages which are not insured or guaranteed as provided in paragraph (1) (such mortgages referred to hereinafter as "conventional mortgages"). No such purchase of a conventional mortgage secured by a property comprising one- to four-family dwelling units shall be made if the outstanding principal balance of the mortgage at the time of purchase exceeds 80 per centum of the value of the property securing the mortgage,

TITLE 12 > CHAPTER 46 > SUBCHAPTER I > Part B > subpart 1 > § 4541     Prev  |
Next

**§ 4541. Regulatory authority**

Except for the authority of the Director of the Office of Federal Housing Enterprise Oversight described in section 4513 (b) of this title and all other matters relating to the safety and soundness of the enterprises, the Secretary of Housing and Urban Development shall have general regulatory power over each enterprise and shall make such rules and regulations as shall be necessary and proper to ensure that this part and the purposes of the Federal National Mortgage Association Charter Act [12 U.S.C. 1716 et seq.] and the Federal Home Loan Mortgage Corporation Act [12 U.S.C. 1451 et seq.] are accomplished.

9.     And pursuant to United States Code Annotated, Title 12 Banks and Banking, Chapter 27 Real Estate Settlement Procedures, Sec. 2602 Definitions; Sec. 2604 Special Information Booklets; Sec. 2802 Definitions; RESPA Reg. X, Sec. 3500.2 Definitions; 3500.5 Coverage of RESPA; 3500.6 Special Information Booklet At Time Of Loan Application; and Sec. 3500.8 Use of HUD-1 or HUD-1A Settlement Statements, It is found that within a few days and up to several months after the closing of such mortgage loans the banking entity will sell the mortgage and promissory note to a GSE (government sponsored enterprise) such as Freddie Mac or Fannie Mae. See United States Code Annotated, Title 2 The Congress, Chapter 17A Congressional Budget And

Fiscal Operations, Secs. 621 and 622; Title 12 Banks And Banking, Chapter 13 National Housing, Subchapter III National Mortgage Associations, Sec. 1717 Federal National Mortgage Association and Government National Mortgage Association; Title 12 Banks And Banking, Chapter 46 Government Sponsored Enterprises, Sec. 4501 Congressional Findings; Sec. 4502 Definitions; Chapter 46 Government Sponsored Enterprises, Subchapter I Supervision And Regulation Of Enterprises, Part A Financial Safety And Soundness Regulator, Sec. 4511 Establishment Of Office Of Federal Housing Enterprise Oversight; Sec. 4512 Director; Sec. 4513 duty And Authority Of Director; Part B Authority Of Secretary, Subpart I General Authority, Sec. 4543 Public Access To Mortgage Information; Chapter 13 National Housing, Sec. 1723a General Powers Of Government National Mortgage Association and Federal National Mortgage Association and; Chapter 16 Federal Deposit Insurance Corporation, Sec. 1811 Federal Deposit Insurance Corporation; **such that virtually all single-family residential mortgage loans are classified as federally related mortgage loans.**

"Federal Home Loan Mortgage Corporation was "agency" subject to disclosure and reporting requirements of this section. **Rocap v Indick, C.A.D.C. 1976, 539 F.2d 174,176 U.S. App.D.C. 172"**

10.     From the documentation cited herein it is seen that generally the banking entity that sold the deed of trust and promissory note to a GSE will sign a mortgage servicing contract with that GSE meaning that the banking entity is now a mortgage servicer. The monthly mortgage payments are sent to that mortgage servicer, they take a percentage of that payment and put it into an escrow account to cover property taxes, homeowners insurance, sewer, road or other assessments. The servicer takes their servicing fee off the balance and sends the remaining balance of principal and interest **onto the GSE.** See United States Code Annotated, Title 12 Banks And Banking, Chapter 11A Federal Home Loan Mortgage Corporation, Sec. 1454 Purchase And Sale Of Mortgages, Residential Mortgages, Conventional Mortgages, Terms And Conditions Of Sale Or Other Disposition, Authority To Enter Into, Perform And Carry Out Transactions; Chapter 27 Real Estate Settlement Procedures, Sec. 2605 Servicing Of Mortgage Loans And Administration Of Escrow Accounts; Regulations For Real Estate Settlement Procedures Regulation X, Part 3500 Real Estate Settlement Procedures Act, Sec. 3500.2 Definitions; and Sec. 3500.21 Mortgage Servicing Transfers

11.     From the documentation further cited herein it is seen as to mortgage foreclosures of single family residential mortgages (federally related mortgage loans) **the only person that has the authority to commence such an action is the Secretary of Housing And Urban Development (HUD).** (The Secretary does have the authority to designate, in writing, natural or un-natural persons (corporations) to act as his foreclosure commissioner) See United States Code Annotated, Title 12 Banks And Banking, chapter 38A Single Family Mortgage Foreclosure, Sections 3752 – 3764

7

12.     The Court is advised all government sponsored enterprises (GSE) are subject to Freedom Of Information Act and Privacy Act requests. See U.S.C.A., Title 5, Sec. 552 Public Information, Agency Rules, Opinions, Orders, Records and Proceedings.

13.     And pursuant to Plaintiff's right to make inquiries to the mortgage servicer requesting information pertaining to one's own mortgage loan, see United States Code Annotated, Title 12 Banks And Banking, Chapter 27 Real Estate Settlement Procedures, Sec. 2605 Servicing Of Mortgage Loans And Administration Of Escrow Accounts and; Part 3500 Real Estate Settlement Procedures Act, Sec. 3500.21 Mortgage Servicing Transfers. See Sec. 3500.21, (e) Duty of loan servicer, (2) Qualified written request, (ii) a mortgage servicer does NOT own the mortgage and promissory note meaning they do not have any equity interest in the mortgaged property. See U.S.C.A.; Title 11 Bankruptcy, Sec. 541 Property Of The Estate and other law referenced herein, **Plaintiff here demands of the Claimant the name of the GSE that the servicer is or was acting under contract with and the servicing contract between the GSE and any and all previous mortgage servicers and the designation of authority from the Sec. of HUD to the GSE, the mortgage servicer or any other party to act as the foreclosure commissioner for said mortgage loans.**

**And pursuant to these facts of how notes may be readily transferred and exchanged in the banking industry,** Plaintiff demands the right to have produced for the Court the original **Deed of trust and Promissory Note of each debt here disputed for examination by the Plaintiff and the Court** for evidence of such **markings on it or an allonge attached or reduced to computer disc showing what exchange, sale or transfer of the loan has been made by one or more of the holders of these instruments since the making of the loan and who actually is now the present legal and actual holder of this debt with standing to have foreclose performed in its name.**

14.     **Where the foreclosing party cannot prove the existence of the note or the substance of the agreement in it, that it is what the offending party agreed to, and that they are still holders to enforce it, then there is no note, there is no agreement, and there is no authority for them to enforce anything empowering them to bring a claim.**

15.     As a matter of law, To recover on a promissory note, the defendant must prove: (1) the existence of the note in question; (2) that the party sued signed the note; (3) that the defendant is the owner or holder of the note; and (4) that a certain balance is due and owing on the note. See *In Re: SMS Financial LLc. v. Abco Homes, Inc.* No.98-50117 February 18, 1999 (5th Circuit Court of Appeals) and the Courts have held further no part payments should be made on the bond or note

8

unless the person to whom payment is made is able to produce the bond or note and the part payments are endorsed thereon.

16.     **If no one is able to produce the "instrument" there is no competent evidence before the Court that any party is the holder of the alleged note or the true holder in due course.** Further, Common law also dictates that the defendant prove the existence of the alleged note in question, prove that the party sued signed the alleged note, prove that the plaintiff is the owner and holder of the alleged note, and prove that certain balance is due and owing on any alleged note. Federal Circuit Courts have ruled that the only way to prove the perfection of any security is by actual possession of the security. See *Matter of Staff Mortg. & Inv. Corp.*, 550 F.2d 1228 (9th Cir 1977).

17.     Possession establishes a prima facie case of ownership. Leathers v. Turner, 75 Ga.App. 62, 41 S.E.2d 921 (1947). And proof of possession by production of the instrument entitles the holder to recover on it unless the opposing party establishes a defense. U.C.C. § 3- 307(2). *Cf.* Pitillo v. Demetry, 112 Ga.App. 643, 145 S.E.2d 792 (1965)

18.     "In a suit on negotiable instruments, the burden is initially on the party suing on the instruments to show *first* that he is a *holder* of the instruments sued on. UCC § 3-302; Hawkland, Cases on Commercial Paper and Bank Deposits and Collections 183 (1967).

19.     We likewise note that defendants failed to submit the reverse sides of the notes in question. No guarantee has been afforded plaintiff that the notes have not been negotiated nor has security been posted; no recovery in these circumstances would be possible in the state courts. Perkins v. Crittenden, 462 S.W.2d 565 (Tex.Sup.1970)

20.     The defect in pleading by defendants suing on notes that as holders of the notes they were entitled to bring the action and the lack of substantiation could not be cured by plaintiff's failure to raise the issue on summary judgment without unjustifiably shifting the defendant's burden of establishing their cause of action to plaintiff. V.T.C.A., Bus. & C. § § 3.301, 3.307(b), 3.603; Fed.Rules Civ.Proc. rule 56(c), 28 U.S.C.A

21.     Absence of proof that defendant's as holders of notes sued on were entitled to bring the action was fatal to defendant's claim for summary judgment. V.T.C.A., Bus. & C. § § 3.301, 3.307(b), 3.603; Fed.Rules Civ.Proc. rule 56(c), 28 U.S.C.A.

McCay     v.     CAPITAL     RESOURCES     COMPANY,     LTD.     96-200     S.W.2d     1997 Where appellee apparently never possessed appellants' original note as provided in Ark. Code Ann. 4-3-309(a)(i) (Repl. 1991), but was required, even if it had, to have proven all three factors specified in 4-3-309(a) and did not do so, appellee could not enforce the original note's terms by the use of a copy; even if all three requirements in 4-3-309(a) had been proven..

Mortgage     Securities     Inc.     v.     Hartley     LORD.     No.     4D02-4051.     July     23,     2003. Mortgagee by assignment brought foreclosure action. The Circuit Court, 15th Judicial Circuit, Palm

Beach County, Edward Fine and John Wessel, JJ., entered summary judgment for mortgagor. Mortgagee appealed. The District Court of Appeal, Stone, J., held that mortgagee could not maintain cause of action to enforce missing promissory note or foreclose mortgage, in absence of proof that mortgagee or assignor ever had possession of note.

22.    FIGUEREDO v. BANK ESPIRITO SANTO No. 88-1808.Jan. 31, 1989. FL Third District. The plaintiff failed to produce for admission into evidence the original copy of a negotiable promissory instrument as is expressly required by section 90.953(1), Florida Statutes (1987). For this reason, the final judgment of foreclosure is vacated with directions for the trial court to receive the original promissory note in evidence

23.    **Where the enforcing party cannot prove the existence of the debt, then there is no debt.**

24.    **This is established as well under  AZ Code 47- 3302, holder in due course. The only notice sufficient to inform all interested parties that a security interest in instruments has been perfected is actual possession by the secured party, his agent or bailee." Bankruptcy Courts have followed the Uniform Commercial Code.** *In Re* Investors & Lenders, Ltd. 165 B.R. **389 (Bkrtcy.D.N.J.1994),**

25.    Unequivocally the Court's rule is that in order to prove the "instrument", possession is mandatory.

26.    Absent this, **the foreclosing party fails to establish for what actual holder it has the right to do so.**

27.    If the foreclosing party cannot produce any competent fact witness **who is** still legal holders of the original, unnegotiated **unconverted**, debt instrument, as the potentially injured party with **personal jurisdiction** and standing to bring this action, which they have not, as a matter of law they cannot be allowed to do so.

28.    And again, pursuant to these facts of how notes may be readily transferred and exchanged in the banking industry, Plaintiff demands the right in this motion to have produced for the Court the original Deed of Trust and Promissory Note for examination by the Plaintiff and the Court for evidence of such markings on it or an allonge attached or reduced to computer disc showing what exchange, sale or transfer of the loan has been made by one or more of

the holders of these instruments since the making of the loan and who actually is now the present legal and actual holder of this debt with standing to have foreclose performed in its name.

## SECOND CAUSE OF ACTION FOR PREDATORY LENDING PRACTICES (AS TO ALL DEFENDANTS)

16.     Plaintiff repeats and re-alleges each of the causes of action of paragraphs 1 through 15 as if set forth in full herein.  Plaintiff is informed and believes, and thereupon alleges, that

17.     Plaintiff is informed and believes, and thereupon alleges, that Defendants, and each of them, have collaborated to engage and engaged in predatory lending practices with respect to Plaintiff in violation of the Home Ownership and Equity Protection Act ("HOEPA"), 15 U.S.C. 1637; the Truth in Lending Act ("TILA"), 15 U.S.C. Section 1601; Regulation Z, 12 C.F.R. Section 226; and specifics of which are unknown, but which are subject to discovery with respect to which the specifics will be alleged by amendment to this Complaint when ascertained.

18.     Plaintiff alleges on information and belief that Defendants, and each of them, in violation of 15 U.S.C. Section 1639(h), proceeded to originate the loans by lowering their own underwriting standards, in order that Plaintiff would be provided with funding that would be financially unbearable and burdensome, and cause default on said loans and place Plaintiff in imminent danger of losing the subject property to non-judicial foreclosure sale.

19.     Plaintiff alleges that Defendants' violation of 15 U.S.C. Section 1639(h) may be remedied only by rescission of the loan, and the payment of compensatory damages to Plaintiff in the sum to make Plaintiff whole.

## THIRD CAUSE OF ACTION FOR QUIET TITLE (AS TO ALL DEFENDANTS)

20.     Plaintiff re-alleges and incorporates by reference the previous allegations appearing in paragraphs 1 through 21 of this Complaint as though set forth herein.

21.     Plaintiff seeks to quiet title against the claims of Defendants as follows:  Defendants hold themselves out as entitled to fee simple ownership of the subject property by and through non-judicial foreclosure, when, in fact, Plaintiff alleges on information and belief that Defendants have no right, title, interest, or estate in the subject property, and no right to conduct a foreclosure sale as either beneficiary or trustee, and Plaintiff's interest is adverse to Defendants' claims that they have a right to ownership and to conduct a sale of the subject property.

22.     Plaintiff seeks to quiet title and therefore seeks a judicial declaration that the title to the subject property is vested in Plaintiff alone, and that Defendants, and each of them, be declared to have no estate, right, title, or interest in the subject property, and that said Defendants, and each of them, be forever enjoined from asserting from estate, right, title, or interest in the subject property

adverse to Plaintiff herein.

23.     Plaintiff demands trial by jury as required under the 7th Amendment to the Constitution of the United States of America.

**PRAYER**

WHEREFORE, Plaintiff prays for judgment and order against Defendants, and each of them, as to each and every cause of action, jointly and severally, as follows:  on first and second causes of action:  (1) compensatory damages according to proof; (2) special damages according to proof; (3) punitive damages according to proof; on third cause of action:  (4) for rescission; (5) for civil penalty pursuant to statute; (6) for actual damages to be proved at trial; (7) for additional damages up to $100,000.00 per Defendant; (8) for such other and further relief the Court may deem just and proper be awarded as well.

Dated:  9/9/2010

_____
Jay Boersma (authorized Signature)
Plaintiff

Exhibit A


CWABS Asset Backed Certificate Trust, ABCT

**PROSPECTUS SUPPLEMENT**
(To Prospectus dated January 26, 2006)

$697,200,100
(Approximate)

# CWABS, INC.

Depositor

[LOGO] Countrywide
**HOME LOANS**
**Sponsor and Seller**

Countrywide Home Loans Servicing LP
Master Servicer

Asset-Backed Certificates Trust 2006-IM1
Issuing Entity

Asset-Backed Certificates, Series 2006-IM1
Distributions are payable on the 25th day of
each month, beginning in February, 2006

The issuing entity will issue certificates, including the following classes of certificates being offered pursuant to this prospectus supplement and the accompanying prospectus:

| Class | Original Certificate Principal Balance(1) | Price to Public | Underwriting Discount | Proceeds to Depositor(2) |
|---|---|---|---|---|
| A-1 | $305,794,000 | 100.00000% | 0.00104% | 99.99896% |
| A-2 | $303,556,000 | 100.00000% | 0.00163% | 99.99838% |
| M-1 | $ 32,900,000 | 100.00000% | 0.00625% | 99.99375% |
| M-2 | $ 19,600,000 | 100.00000% | 0.00778% | 99.99223% |
| M-3 | $ 5,950,000 | 100.00000% | 0.01250% | 99.98750% |
| M-4 | $ 8,750,000 | 100.00000% | 0.01333% | 99.98667% |
| M-5 | $ 6,300,000 | 100.00000% | 0.01458% | 99.98542% |
| M-6 | $ 3,850,000 | 100.00000% | 0.01667% | 99.98333% |
| M-7 | $ 3,500,000 | 99.17790% | 0.01875% | 99.15915% |
| M-8 | $ 3,500,000 | 98.16115% | 0.02083% | 98.14032% |
| B | $ 3,500,000 | 95.26670% | 0.02500% | 95.24170% |
| A-R | $ 100 | (3) | (3) | (3) |

Consider carefully the risk factors beginning on page S-12 in this prospectus
supplement and on page 2 in the prospectus.

The certificates represent obligations of the issuing entity only and do not represent an interest in or obligation of CWABS, Inc., Countrywide Home Loans, Inc., Countrywide Home Loans Security LP or any of their affiliates.

This prospectus supplement may be used to offer and sell the offered certificates only if accompanied by the prospectus.

1) This amount is subject to a permitted variance in the aggregate of plus or minus 5%.

2) Before deducting expenses payable by the Depositor estimated to be approximately $660,000 in the aggregate.

) The Class A-R certificates will not be purchased by the underwriters and are being transferred to Countrywide Home Loans, Inc. as partial nsideration for the sale of the mortgage loans. See "Method of Distribution" in this prospectus supplement.

ie classes of certificates offered by this prospectus supplement are listed, together with their interest rates, in the tables under "Summary -- escription of the Certificates" on page S-3 of this prospectus supplement. This prospectus supplement and the accompanying prospectus relate ily to the offering of the certificates listed above and not to the other classes of certificates that will be issued by the issuing entity.

ie certificates represent interests in a pool of adjustable rate, credit blemished mortgage loans that are secured by first liens on one- to four- mily residential properties, as described in this prospectus supplement.

redit Enhancement for the certificates may consist of:

Overcollateralization; and

Subordination.

ie credit enhancement for each class of certificates varies. Not all credit enhancement is available for every class. The credit enhancement for e certificates is described in more detail in this prospectus supplement.

nese securities have not been approved or disapproved by the Securities and Exchange Commission or any state securities commission nor is the Securities and Exchange Commission or any state securities commission passed upon the accuracy or adequacy of this prospectus ipplement or the prospectus. Any representation to the contrary is a criminal offense.

**Countrywide Securities Corporation**

January 27, 2006

Table of Contents

Prospectus Supplement                                    Page
                                                         ----

Summary ................................................  S-1
Summary of Transaction Parties .........................  S-11
Risk Factors ...........................................  S-12
The Mortgage Pool ......................................  S-21
    General ............................................  S-21
    The Statistical Calculation Pool ...................  S-23
    Assignment of the Mortgage Loans ...................  S-24
The Originator .........................................  S-26
    Underwriting Standards .............................  S-27
    General ............................................  S-27
    Details of Specific Programs .......................  S-27
    The Progressive Series Program .....................  S-28
    The Progressive Express(TM) Programs ...............  S-32
        Progressive Express(TM) Programs with Documentation
        ..............................................  S-32
    Progressive Express(TM) No Doc Program .............  S-34
Servicing of the Mortgage Loans ........................  S-35
    General ............................................  S-35
    The Master Servicer ................................  S-36
    Countrywide Home Loans .............................  S-36
    Loan Servicing .....................................  S-38
    Collection Procedures ..............................  S-39
    Foreclosure and Delinquency Experience .............  S-39
    Servicing Compensation and Payment of Expenses ....  S-40
    Adjustment to Servicing Fee in Connection
        With Certain Prepaid Mortgage Loans ............  S-40
    Advances ...........................................  S-41
The Issuing Entity .....................................  S-41
Static Pool Data .......................................  S-42
Description of the Certificates ........................  S-42
    General ............................................  S-42
    Denominations ......................................  S-43
    Book-Entry Certificates ............................  S-43
    Glossary of Terms ..................................  S-43
    Deposits to the Certificate Account ................  S-51
    Withdrawals from the Certificate Account ...........  S-52
    Deposits to the Distribution Account ...............  S-53
    Withdrawals from the Distribution Account ..........  S-53
    Investments of Amounts Held in Accounts ............  S-54
    Fees and Expenses ..................................  S-55
    Distributions ......................................  S-57
    Overcollateralization Provisions ...................  S-59
    The Corridor Contract ..............................  S-60
    Calculation of One-Month LIBOR .....................  S-62
    Carryover Reserve Fund .............................  S-63
    Applied Realized Loss Amounts ......................  S-63
    Reports to Certificateholders ......................  S-63
    Amendment ..........................................  S-65
    Voting Rights ......................................  S-65
    Optional Purchase of Defaulted Loans ...............  S-66
    Events of Default ..................................  S-66
    Rights Upon Event of Default .......................  S-66
    Optional Termination ..............................  S-67

Prospectus                                                              page
                                                                        Cert

ain Matters Regarding the Master Servicer,
the Depositor, the Sellers and
the NIM Insurer ................................   S-68
The Trustee ......................................   S-68
Restrictions on Transfer of the Class A-R Certificates
..................................................   S-70
Ownership of the Residual Certificates ...........   S-70
Restrictions on Investment, Suitability Requirements
.............................................. S-70
Rights of the NIM Insurer Under the Pooling
and Servicing Agreement ..........................   S-70
Yield, Prepayment and Maturity Considerations ........   S-71
General ..........................................   S-71
Prepayments and Yields for the Offered Certificates
.............................................. S-71
Last Scheduled Distribution Date ..................   S-73
Prepayment Model ..................................   S-73
Decrement Tables: Weighted Average Lives .........   S-74
Legal Proceedings ..................................   S-86
Material Federal Income Tax Consequences .............   S-86
Characterization of the Offered Certificates .....   S-87
Special Tax Considerations Applicable
to Residual Certificates .........................   S-87
Other Taxes .........................................   S-88
ERISA Considerations ...............................   S-88
Method of Distribution ...............................   S-90
Use of Proceeds ....................................   S-92
Legal Matters ......................................   S-92
Ratings ............................................   S-93
Index of Defined Terms .............................   S-94
ANNEX A .............................................   A-1

----

Important Notice About Information in This
   Prospectus and Each Accompanying
   Prospectus Supplement ................................ 4

Risk Factors ........................................ 5

The Trust Fund ...................................... 16

Use of Proceeds ..................................... 22

The Depositor ....................................... 22

Loan Program ........................................ 22

Description of the Securities ....................... 25

Credit Enhancement .................................. 41

Yield and Prepayment Considerations ................. 46

The Agreements ...................................... 49

Certain Legal Aspects of the Loans .................. 63

Material Federal Income Tax Consequences ............ 77

Other Tax Considerations ............................ 98

ERISA Considerations ................................ 99

Legal Investment .................................... 102

Method of Distribution .............................. 103

Legal Matters ....................................... 104

Financial Information ............................... 104

i

Prospectus                                                    page

Rating ..................................................  104

Index to Defined Terms ..................................  106

ii

## SUMMARY

This summary highlights selected information from this document and does not contain all of the information that you need to consider when making your investment decision. To understand all of the terms of an offering of the certificates, read this entire document and the accompanying prospectus carefully.

While this summary contains an overview of certain calculations, cash flow priorities and other information to aid your understanding, you should read carefully the full description of these calculations, cash flow priorities and other information in this prospectus supplement and the accompanying prospectus before making any investment decision.

**Issuing Entity**

Asset-Backed Certificates Trust 2006-IM 1, a common law trust formed under the laws of the State of New York.

See "The Issuing Entity" in this prospectus supplement.

**Depositor**

CWABS, Inc., a Delaware corporation and a limited purpose finance subsidiary of Countrywide Financial Corporation, a Delaware corporation.

See "The Depositor" in the prospectus.

**Sponsor and Sellers**

Countrywide Home Loans, Inc. will be the sponsor of the transaction and a seller of the mortgage loans. Other sellers may include one or more special purpose entities established by Countrywide Financial Corporation or one of its subsidiaries, which acquired the mortgage loans they are selling directly from Countrywide Home Loans, Inc.

See "Servicing of the Mortgage Loans -- Countrywide Home Loans" in this prospectus supplement.

**Master Servicer**

**Countrywide Home Loans Servicing LP.**

See "Servicing of the Mortgage Loans -- The Master Servicer" in this prospectus supplement.

**Trustee**

**The Bank of New York.**

See "Description of the Certificates -- The Trustee" in this prospectus supplement.

**Originator**

**Impac Funding Corporation.**

See "The Originator" in this prospectus supplement.

**The NIM Insurer**

After the closing date, a separate trust or trusts (or other form of entity) may be established to issue net interest margin securities secured by all or a portion of the Class C and Class P Certificates. Those net interest margin securities may have the benefit of one or more financial guaranty insurance policies that guaranty payments on those securities. The insurer or insurers issuing these financial guaranty insurance policies are referred to in this prospectus supplement as the "NIM Insurer." The references to the NIM Insurer in this prospectus supplement apply only if the net interest margin securities are so insured. **Guarantee only payment not the risk itself?**

Any NIM Insurer will have a number of rights under the pooling and servicing agreement that will limit and otherwise affect the rights of the holders of the offered certificates. Any insurance policy issued by a NIM Insurer will not cover, and will not benefit in any manner whatsoever, the offered certificates.

See "Risk Factors--Rights of the NIM Insurer" in this prospectus supplement.

Pooling and Servicing Agreement

...e pooling and servicing agreement among the sellers, the master servicer, the depositor and the trustee, under which the issuing entity will be ...rmed.

...ut-off Date

...e later of January 1, 2006 and the origination date of that mortgage loan.

...osing Date

...n or about January 30, 2006.

S-1

**The Mortgage Loans**

The mortgage pool will consist of adjustable rate, credit-blemished mortgage loans that are secured by first liens on one- to four-family properties.

See "The Mortgage Pool" in this prospectus supplement.

**Statistical Calculation Information**

The statistical information presented in this prospectus supplement relates to a statistical calculation pool that does not reflect all of the mortgage loans that will be included in the issuing entity. Additional mortgage loans will be included in the mortgage pool on the closing date. In addition, certain mortgage loans in the statistical calculation pool may not be included in the mortgage pool on the closing date because they have prepaid in full or were determined not to meet the eligibility requirements for the mortgage pool.

The information with respect to the statistical calculation pool is, unless otherwise specified, based on the scheduled principal balances as of January 1, 2006, which is the statistical calculation date. The aggregate stated principal balance of the statistical calculation pool as of the statistical calculation date is referred to as the statistical calculation date pool principal balance.

Unless otherwise noted, all statistical percentages are measured by the statistical calculation date pool principal balance.

As of the statistical calculation date, the mortgage loans in the statistical calculation pool had the following characteristics:

```
Aggregate Current Principal Balance            $700,000,400
Weighted Average Mortgage Rate                 6.520%
Range of Mortgage Rates                        3.990% to
                                 11.990%
Average Current Principal Balance              $286,533
Range of Outstanding Principal Balances        $49,000 to
                              $2,050,000
Weighted Average Original LTV                  79.07%
Weighted Average Original Term to Maturity     360 months
Weighted Average Credit Risk Score             675
Weighted Average Remaining Term to Stated
  Maturity                                     357
months
Geographic Concentrations in excess of
  10%:
  California                                   52.91%
  Florida                                      10.31%
```

S-2

## Description of the Certificates

The issuing entity will issue fourteen classes of certificates, twelve of which are offered by this prospectus supplement and the accompanying prospectus:

| Class<br><br>Offered Certificates | Initial<br>Certificate<br>Principal<br>Balance    (1) | Type | Final<br>Scheduled<br>Distribution<br>Date<br>(2) | Initial<br>Rating<br>(Moody's) (3) | Initial<br>Rating<br>(S&P)(3) |
|---|---|---|---|---|---|
| A-1...................... | $305,794,000 | Senior/Adjustable Rate | September 2028 | Aaa | AAA |
| A-2...................... | $303,556,000 | Senior/Adjustable Rate | April 2036 | Aaa | AAA |
| M-1...................... | $  32,900,000 | Subordinate/Adjustable Rate | March 2036 | Aa1 | AA+ |
| M-2...................... | $  19,600,000 | Subordinate/Adjustable Rate | February 2036 | Aa2 | AA |
| M-3...................... | $   5,950,000 | Subordinate/Adjustable Rate | January 2036 | Aa3 | AA- |
| M-4...................... | $   8,750,000 | Subordinate/Adjustable Rate | December 2035 | A1 | A+ |
| M-5...................... | $   6,300,000 | Subordinate/Adjustable Rate | October 2035 | A2 | A |
| M-6...................... | $   3,850,000 | Subordinate/Adjustable Rate | August 2035 | A3 | A- |
| M-7...................... | $   3,500,000 | Subordinate/Adjustable Rate | May 2035 | Baa1 | BBB+ |
| M-8...................... | $   3,500,000 | Subordinate/Adjustable Rate | January 2035 | Baa2 | BBB |
| B........................ | $   3,500,000 | Subordinate/Adjustable Rate | March 2034 | Baa3 | BBB- |
| A-R...................... | $         100 | Senior/REMIC Residual | February 2006 | Aaa | AAA |
| **Non-Offered Certificates(4)** | | | | | |
| Class P ................. | N/A | Prepayment Charges | N/A | NR | NR |
| Class C ................. | N/A | REMIC Regular | N/A | NR | NR |

(1) This amount is subject to a permitted variance in the aggregate of plus or minus 5% depending on the amount of mortgage loans actually delivered on the closing date.

(2) Each date was determined as described under "Yield, Prepayment and Maturity Considerations" in this prospectus supplement.

(3) The offered certificates will not be offered unless they are assigned the indicated ratings by Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P"). "N/R" indicates that the agency was not asked to rate the certificates. A rating is not a recommendation to buy, sell or hold securities. These ratings may be lowered or withdrawn at any time by either of the rating agencies. See "Ratings" in this prospectus supplement.

(4) The Class C and Class P Certificates are not offered by this prospectus supplement. Any information contained in this prospectus supplement with respect to the Class C and Class P Certificates is provided only to permit a better understanding of the offered certificates.

The certificates will also have the following characteristics:

| Class | Pass-Through Rate Before Optional Termination Date (1) | Pass-Through Rate After Optional Termination Date (1) | Delay/Accrual Period | Interest Accrual Convention |
|---|---|---|---|---|
| **Offered Certificates** | | | | |
| A-1 .............. | LIBOR+ 0.090% (2) | LIBOR + 0.180% (2) | 0 day/25th to24th (3) | Actual/360 (4) |
| A-2 .............. | LIBOR + (2) | LIBOR + 0.480% (2) | 0 day/25th to24th (3) | Actual/360 (4) |
| M-1 .............. | LIBOR + (2) | LIBOR + 0.600% (2) | 0 day/25th to24th (3) | Actual/360 (4) |
| M-2 .............. | LIBOR + (2) | LIBOR + 0.630% (2) | 0 day/25th to24th (3) | Actual/360 (4) |
| M-3 .............. | LIBOR + (2) | LIBOR + 0.675% (2) | 0 day/25th to24th (3) | Actual/360 (4) |
| M-4 .............. | LIBOR + (2) | LIBOR + 0.930% (2) | 0 day/25th to24th (3) | Actual/360 (4) |
| M-5 .............. | LIBOR + (2) | LIBOR + 0.975% (2) | 0 day/25th to24th (3) | Actual/360 (4) |
| M-6 .............. | LIBOR + (2) | LIBOR + 1.050% (2) | 0 day/25th to24th (3) | Actual/360 (4) |
| M-7 .............. | LIBOR + (2) | LIBOR + 1.950% (2) | 0 day/25th to24th (3) | Actual/360 (4) |
| M-8 .............. | LIBOR + (2) | LIBOR + 1.950% (2) | 0 day/25th to24th (3) | Actual/360 (4) |
| B .............. | LIBOR + (2) | LIBOR + 1.950% (2) | 0 day/25th to24th (3) | Actual/360 (4) |
| A-R .............. | (5) | (5) | N/A | N/A |
| **Non-Offered Certificates** | | | | |
| Class P........ | N/A | N/A | N/A | N/A |
| Class C........ | N/A | N/A | N/A | N/A |

1) If on any distribution date, the pass-through rate for a class of offered certificates (other than the Class A-R Certificates) is based on the applicable interest rate cap, each holder of the applicable certificates will be entitled to receive the resulting shortfall from remaining excess cashflow (if any) to the extent described in this prospectus supplement under "Description of the Certificates -- Overcollateralization Provisions", and from payments allocated to the issuing entity (if any) in respect of the interest rate corridor contract as described in this prospectus supplement under "Description of the Certificates -- Distributions -- Distributions of Funds from the Corridor Contract."

2) The pass-through rates may adjust monthly, will be subject to increase after the optional termination date as shown in this table and will be subject to an interest rate cap, as described in this prospectus supplement under "Description of the Certificates -- Distributions -- Distributions of Interest." LIBOR refers to One-Month LIBOR for the related interest accrual period calculated as described in this prospectus supplement under "Description of the Certificates -- Calculation of One-Month LIBOR."

3) The interest accrual period for any distribution date will be the one-month period from and including the preceding distribution date (or from and including the closing date, in the case of the first distribution date) to and including the day prior to the current distribution date.

4) Interest accrues at the rate specified in this table based on a 360-day year and the actual number of days elapsed during the related accrual period.

5) The Class A-R Certificates will not accrue any interest.

See "Description of the Certificates" in this prospectus supplement.

Designations

| Designation | Class of Certificates |
|---|---|
| Class A Certificates. Certificates: | Class A-1 and Class A-2 |
| Senior Certificates. Certificates: | Class A and Class A-R |
| Class M Certificates: | Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7 and Class M-8 Certificates. |
| Subordinate Certificates. Certificates: | Class M and Class B |
| Adjustable Rate Certificates. Certificates: | Class A Certificates and the Subordinate. |
| Offered Certificates: | Senior Certificates and the Subordinate Certificates. |

**Record Date**

**Adjustable Rate Certificates:**

The business day immediately preceding a distribution date, or if the adjustable rate certificates are no longer book-entry certificates, the last business day of the month preceding the month of a distribution date.

**Class A-R Certificates:**

The last business day of the month preceding the month of a distribution date.

**Denominations**

$20,000 and multiples of $1,000 in excess thereof, except that the Class A-R Certificates will be issued as two certificates in the denominations specified in the pooling and servicing agreement.

**Registration of Certificates**

**Offered Certificates other than the Class A-R Certificates:**

Book-entry form. Persons acquiring beneficial ownership interests in the offered certificates (other than the Class A-R Certificates) may elect to hold their beneficial interests through The Depository Trust Company, in the United States, or Clearstream, Luxembourg or the Euroclear System, in Europe.

**Class A-R Certificates:**

Fully registered certificated form. The Class A-R Certificates will be subject to certain restrictions on transfer described in this prospectus supplement and as more fully provided for in the pooling and servicing agreement.

See "Description of the Certificates -- Book-Entry Certificates" and "-- Restrictions on Transfer of the Class A-R Certificates" in this prospectus supplement.

**Distribution Dates**

Beginning on February 27, 2006, and thereafter on the 25th day of each calendar month, or if the 25th is not a business day, the next business day.

**Interest Payments**

On each distribution date, holders of each class of adjustable rate certificates will be entitled to receive:

the interest that has accrued during the related accrual period at the related pass-through rate on the certificate principal balance thereof immediately prior to the applicable distribution date, and

any interest due on such class on a prior distribution date that was not paid.

The related accrual period, interest calculation convention and pass-through rate for each class of interest-bearing certificates is shown in the table on page S-4.

For each class of subordinate certificates, any interest carry forward amount (which is interest due on a prior distribution date that was not paid on a prior distribution date) will be payable from excess cashflow only, as and to the extent described in this prospectus supplement.

There are certain circumstances that could reduce the amount of interest paid to you.

See "Description of the Certificates -- Distributions -- Distributions of Interest" in this prospectus supplement.

**Principal Payments**

On each distribution date, certificateholders will only receive a distribution of principal on their certificates if there is cash available on that date for the payment of principal. The manner of distributing principal among the classes of certificates will depend on the priority of payments, which will differ, as described in this prospectus supplement, depending upon

S-5

whether a distribution date occurs before the stepdown date, or on or after that date, and will depend on the loss and delinquency performance of the mortgage loans.

See "Description of the Certificates -- Distributions -- Distributions of Principal Distributable Amount" in this prospectus supplement.

## Amounts Available for Distributions on the Certificates

### Amounts Available with respect to Interest Distributions

The amount available for interest distributions on the certificates on any distribution date will generally consist of the following amounts (subject to the amounts to be netted as described below):

) scheduled payments of interest on the mortgage loans collected during the applicable period less the related servicing fees;

) interest on prepayments to the extent not allocable to the master servicer as additional servicing compensation;

) interest amounts advanced by the master servicer and any required compensating interest paid by the master servicer related to certain prepayments on certain mortgage loans; and

) liquidation proceeds on the mortgage loans during the applicable period (to the extent allocable to interest) ; and

) any seller shortfall interest on the mortgage loans on the first distribution date.

### Amounts Available with respect to Principal Distributions

The amount available for principal distributions on the certificates on any distribution date will generally consist of the following amounts (subject to the amounts to be netted as described below):

) scheduled payments of principal of the mortgage loans collected during the applicable period or advanced by the master servicer;

) prepayments collected in the applicable period;

) the stated principal balance of any mortgage loans repurchased or purchased by a seller or the master servicer, as applicable;

) the difference, if any, between the stated principal balance of a substitute mortgage loan and the related deleted mortgage loan;

) liquidation proceeds on the mortgage loans during the applicable period (to the extent allocable to principal); and

) excess interest (to the extent available) to maintain the targeted overcollateralization level for the related class of certificates as described under "Description of the Certificates -- Overcollateralization Provisions" in this prospectus supplement.

## Fees and Expenses

The amounts available for distributions on the certificates on any distribution date generally will be net of the following amounts:

) the servicing fee and additional servicing compensation (as described in this prospectus supplement under "Description of the Certificates -- Withdrawals from the Collection Account" and "--Withdrawals from the Distribution Account") due to the master servicer;

) the trustee fee due to the trustee;

) amounts reimbursed to the master servicer and the trustee in respect of advances previously made by them and other amounts for which the master servicer and servicer are entitled to be reimbursed;

) all prepayment charges (which are distributable only to the Class P Certificates); and

) all other amounts for which the depositor, a seller, the master servicer or any NIM Insurer is entitled to be reimbursed.

Any amounts net from the amount available for distribution to the certificateholders will reduce the amount distributed to the certificateholders.

## Servicing Compensation

### Servicing Fee:

The master servicer will be paid a monthly fee (referred to as the servicing fee) with respect to each mortgage loan equal to one-twelfth of the stated principal balance of that mortgage loan multiplied by 0.375% per annum (referred to as the servicing fee rate).

S-6

**Additional Servicing Compensation:**

The master servicer is also entitled to receive additional servicing compensation from amounts in respect of interest paid on certain principal prepayments, late payment fees, assumption fees and other similar charges (excluding prepayment charges) and investment income earned on amounts on deposit in the certain of the issuing entity's accounts.

**Source and Priority of Payments:**

These amounts will be paid to the master servicer from collections on the mortgage loans prior to any distributions on the certificates.

See "Servicing of the Mortgage Loans -- Servicing Compensation and Payment of Expenses," "Description of the Certificates -- Withdrawals from the Certificate Account" and "-- Withdrawals from the Distribution Account" in this prospectus supplement.

**Priority of Payments; Distributions of Interest**

In general, on any distribution date, interest funds will be distributed in the following order:

o concurrently to each class of Class A Certificates, current interest and interest carry forward amounts, pro rata based on their respective entitlements;

o sequentially, in order of their seniority, to each class of subordinate certificates, current interest for each class; and

o as part of the excess cashflow.

**Priority of Payments; Distributions of Principal**

**General**

The manner of distributing principal among the classes of certificates will differ, as described in this prospectus supplement, depending upon whether a distribution date occurs before the stepdown date, or on or after that date, and depending on whether a trigger event is in effect.

**Effect of the Stepdown Date if a Trigger Event is not in Effect**

The "stepdown date" refers to the date on or after which the principal payment priorities change so that on any distribution date on or after the stepdown date (and so long as no trigger event is in effect), instead of allocating all amounts distributable as principal on the certificates to the senior classes of certificates until those senior classes are paid in full, a portion of those amounts distributable as principal will be allocated to the subordinate certificates.

The amount allocated to each class of certificates on or after the stepdown date and so long as no trigger event is in effect will be based on the targeted level of overcollateralization and subordination for each class of certificates. These amounts are described in more detail under "Description of the Certificates -- Distributions -- Distributions of Principal Distribution Amount" in this prospectus supplement.

**Trigger Events:**

A "trigger event" refers to certain triggers related to the loss and delinquency performance of the mortgage loans. After the stepdown date, if certain trigger events are in effect, the priority of principal payments will revert to the payment priority prior to the stepdown date.

Generally, prior to the stepdown date or if a trigger event is in effect, all amounts distributable as principal on a distribution date will be allocated first to the senior certificates, until the senior certificates are paid in full, before any distributions of principal are made on the subordinate certificates.

**The Stepdown Date:**

The stepdown date for each class of certificates will be the earlier to occur of:

o the distribution date on which the aggregate certificate principal balance of the senior certificates (prior to distributions on such distribution date) is reduced to zero; and

o the later to occur of:

o the distribution date in February 2009 or

) the distribution date on which the aggregate certificate principal balance of the senior certificates (after calculating anticipated distributions on such distribution date) is less than or equal to 74.10% of the aggregate stated principal balance of the mortgage loans for such distribution late.

**Events that Effect Allocations of Principal**

n general, on any distribution date prior to the stepdown date or on which a trigger event is in effect, the principal distribution amount will be listributed in the following order:

S-7

sequentially, to the Class A-R, Class A-1 and Class A-2 Certificates, in each case until the certificate principal balance thereof is reduced to zero;

sequentially, in order of their seniority, to each class of subordinate certificates, until the certificate principal balance of each class is reduced to zero; and

as part of the excess cashflow.

In general, on any distribution date on or after the stepdown date and so long as no trigger event is in effect, the principal distribution amount will be distributed in the following order:

sequentially, to the Class A-1 and Class A-2 Certificates, in an amount up to the Class A principal distribution amount, in each case until the certificate principal balance thereof is reduced to zero;

sequentially, in order of their seniority, to each class of subordinate certificates, in an amount up to the subordinate class principal distribution amount for that class, until the certificate principal balance thereof is reduced to zero; and

as part of the excess cashflow.

### Excess Cashflow

Excess cashflow generally refers to the remaining amounts (if any) available for distribution to the certificates after interest and principal distributions have been made.

In general, on any distribution date, the excess cashflow (if any) will be distributed in the following order:

to each class of adjustable rate certificates, in the same priority as described above with respect to payments of principal, the amount necessary to meet the overcollateralization target amount;

to the Class A-1 and Class A-2 Certificates, pro rata, based on the amount of the unpaid realized loss amount for each such class, any unpaid realized loss amount for the Class A Certificates;

to each class of subordinate certificates sequentially, in order of their seniority, in each case, first, any interest carry forward amount and second, any unpaid realized loss amount for each class, in that order;

to each class of adjustable rate certificates (after payments of amounts available (if any) under the corridor contract), pro rata, to the extent needed to pay any unpaid net rate carryover for the adjustable rate certificates;

to the carryover reserve fund, the required carryover reserve fund deposit; and

to the Class C and Class A-R Certificates, as specified in the pooling and servicing agreement.

### Credit Enhancement

Credit enhancements provide limited protection to holders of certain certificates against shortfalls in payments received on the mortgage loans. This transaction employs the following forms of credit enhancement:

### Overcollateralization

On the closing date, it is expected that the sum of the aggregate stated principal balance of the mortgage loans will exceed the initial aggregate certificate principal balance of the certificates by approximately $2,800,300. This amount is called "overcollateralization" and is approximately equal to the required initial level of overcollateralization required by the pooling and servicing agreement.

On any distribution date, the amount of overcollateralization (if any) will be available to absorb the losses from liquidated mortgage loans that would otherwise be allocated to the certificates, if those losses are not otherwise covered by excess cashflow (if any) from the mortgage loans. The required levels of overcollateralization may change over time.

The mortgage loans are expected to generate more interest than is needed to pay interest on the certificates because the weighted average interest rate of the mortgage loans is expected to be higher than the weighted average pass-through rate on the certificates, plus the weighted average expense fee rate. The "expense fee rate" is the sum of the servicing fee rate and the trustee fee rate. Any interest payments received in respect of the mortgage loans in excess of the amount that is needed to pay interest on the certificates, and the issuing entity's expenses, will be used to maintain or restore the required level of overcollateralization.

See "Description of the Certificates--Overcollateralization Provisions" in this prospectus supplement.

S-8

## ubordination

he issuance of senior certificates and subordinate certificates by the issuing entity is designed to increase the likelihood that senior ertificateholders will receive regular payments of interest and principal.

he Class A Certificates will have a payment priority over the subordinate certificates. With respect to the subordinate certificates, the Class M ertificates with a lower numerical designation will have a payment priority over Class M Certificates with a higher numerical designation and d the Class M Certificates will have a payment priority over the Class B Certificates.

ubordination is designed to provide the holders of certificates having a higher payment priority with protection against losses realized when the emaining unpaid principal balance of a mortgage loan exceeds the proceeds recovered upon the liquidation of that mortgage loan. In general, iis loss protection is accomplished by allocating realized losses among the subordinate certificates, beginning with the subordinate certificates with le lowest payment priority. In addition, if the aggregate certificate principal balance of the subordinate certificates has been reduced to zero as a esult of the allocation of realized losses, any additional realized losses on the mortgage loans will be allocated to the Class A Certificates on a ro rata basis, in each case until the certificate principal balance thereof is reduced to zero.

## he Corridor Contract

ountrywide Home Loans has purchased an interest rate corridor contract which will be assigned to the trustee, in its capacity as corridor ontract administrator, on the closing date.

ln or prior to the corridor contract termination date, the corridor contract counterparty will be required to make monthly payments to the orridor contract administrator, if one-month LIBOR for the related payment date moves above a specified rate, subject to a maximum rate of ayment. Payments made under the corridor contract will be made to the corridor contract administrator and allocated between the issuing ntity and Countrywide Home Loans as described in "Description of the Certificates -- The Corridor Contract" in this prospectus supplement.

he amounts allocated to the issuing entity in respect of the corridor contract will be available to the adjustable rate certificates, as described in iis prospectus supplement, to cover net rate carryover resulting from the application of the net rate cap to the related pass-through rate.

ny amounts received in respect of the corridor contract and allocated to the issuing entity for a distribution date that are not used on that date ɔ cover net rate carryover on the certificates are expected to be distributed to the holders of the Class C Certificates as provided in the pooling nd servicing agreement and will not be available thereafter for payment of net rate carryover on any class of certificates.

lthough ongoing payments are not required under the corridor contract, certain termination payments may be required as described in Description of the Certificates -- The Corridor Contract" in this prospectus supplement.

## llocation of Losses

fter the credit enhancement provided by excess cashflow and overcollateralization (if any) have been exhausted, collections otherwise ayable to subordinate classes will comprise the sole source of funds from which credit enhancement is provided to the senior certificates. ealized losses are allocated to the subordinate certificates, beginning with the subordinate certificates with the lowest payment priority, until the rincipal balance of that subordinate class has been reduced to zero. If the aggregate certificate principal balance of the subordinate certificates as been reduced to zero, realized losses on the mortgage loans will be allocated to the Class A Certificates pro rata until the certificate principal alance of that class is reduced to zero.

## dvances

he master servicer will make cash advances with respect to delinquent payments of principal and interest on the mortgage loans to the extent tha le master servicer reasonably believes that the cash advances can be repaid from future payments on the related mortgage loans. These cash dvances are only intended to maintain a regular flow of scheduled interest and principal payments on the certificates and are not intended to uarantee or insure against losses.

ee "Servicing of the Mortgage Loans -- Advances" in this prospectus supplement.

Repurchase, Substitution and Purchase of Mortgage Loans

The sellers may be required to repurchase, or substitute, a replacement mortgage loan for any mortgage loan as to which there exists deficient documentation or as to which there has been an uncured breach of any representation or warranty relating to the characteristics of the mortgage loans that materially and adversely affects the interests of the certificateholders in that mortgage loan.

Additionally, the master servicer may purchase from the issuing entity any mortgage loan that is delinquent in payment by 150 days or more.

The purchase price for any mortgage loans repurchased or purchased by a seller or the master servicer will be generally equal to the stated principal balance of the mortgage loan plus interest accrued at the applicable mortgage rate (and in the case of purchases by the master servicer, less the servicing fee rate).

See "The Mortgage Pool -- Assignment of the Mortgage Loans" and "Description of the Certificates -- Optional Purchase of Defaulted Loans" in this prospectus supplement and "Loan Program -- Representations by Seller; Repurchases" in the prospectus.

Optional Termination

The master servicer may purchase all of the remaining assets of the issuing entity on any distribution date on or after the first distribution date on which the aggregate stated principal balance of the mortgage loans and any foreclosed real estate owned by the issuing entity declines to or below 10% of the aggregate stated principal balance of the mortgage loans as of the cut-off date. If the master servicer exercises the optional termination right it will result in the early retirement of the certificates. The NIM Insurer may also have the right to purchase all of the remaining assets in the issuing entity.

See "Description of the Certificates -- Optional Termination" in this prospectus supplement.

Material Federal Income Tax Consequences

For federal income tax purposes, the issuing entity (other than a carryover reserve fund and amounts allocated to the issuing entity pursuant to a corridor contract) will comprise multiple real estate mortgage investment conduits, organized in a tiered REMIC structure. The offered certificates (excluding the right to receive payments from the carryover reserve fund) (other than the Class A-R Certificates), Class C Certificates and Class P Certificates will represent beneficial ownership of REMIC "regular interests" in a REMIC identified in the pooling and servicing agreement.

The Class A-R Certificates will represent the beneficial ownership of the sole class of "residual interests" in each REMIC.

The offered certificates, other than the Class A-R Certificates, will also represent the beneficial interest in the right to receive payments from a carryover reserve fund pursuant to the pooling and servicing agreement. See "Material Federal Income Tax Consequences" in this prospectus supplement and in the prospectus.

Legal Investment Considerations

The Class A, Class M-1, Class M-2 and Class M-3 Certificates will be "mortgage related securities" for purposes of the Secondary Mortgage Market Enhancement Act of 1984. None of the other classes of offered certificates will be "mortgage related securities" for purposes of the Secondary Mortgage Market Enhancement Act of 1984.

See "Legal Investment" in the prospectus.

ERISA Considerations

The offered certificates (other than the Class A-R Certificates) may be purchased by a pension or other benefit plan subject to the Employee Retirement Income Security Act of 1974, as amended, or Section 4975 of the Internal Revenue Code of 1986, as amended, or by an entity investing the assets of a benefit plan, so long as certain conditions are met.

See "ERISA Considerations" in this prospectus supplement and in the prospectus.

S-23

**SUMMARY OF TRANSACTION PARTIES**

```
                              -----------------------------
                                  Sponsor and Seller
                              -----------------------------
                           Countrywide Home Loans, Inc.
                                          Corridor Contract
              Mortgage Loans                Counterparty
                                          -----------------------
                                          Bear Stearns Financial
                              Mortgage Loans Products Inc.
                                          -----------------------

                                          Corridor
                                          Contract
                                          Payments
                                          -----------------------
                                 Excess Corridor
                                 Contract Payments
                                                  -----------------
                                                  -----------------

        -----------------------Corridor Contract
                              Administrator
                     The Bank of New York
              Other Sellers
              --------------
        Special Purpose Entities
                                    Mortgage
        Loans
        Created by the Sponsor
                                 Depositor
                                 -----------
                              CWABS, Inc.
                                          Net Corridor
                                     Contract Payments

                                     Mortgage Loans

        ----------------------      ----------------------------
        Master Servicer              Issuing Entity
         and Servicer Mortgage
                     Loan            Asset-Backed
```

Countrywide Home
Loans Servicing LP

Servicing    Certificates Trust
2006-IM1

Trustee

The Bank of New York

S-11

S-25

## RISK FACTORS

he following information, which you should carefully consider, identifies certain significant sources of risk associated with an investment in
e certificates. You should also carefully consider the information set forth under "Risk Factors" in the prospectus.

he Mortgage Loans Were
nderwritten to Standards Which
o Not Conform to the Standards
'Fannie Mae or Freddie Mac
'hich May Result in Losses on

the Mortgage
Loans.................................The underwriting standards pursuant to
which the mortgage loans were
originated are more flexible than the standards generally used by mortgage
originators for borrowers with
non-blemished credit histories with regard to the borrower's credit
standing and repayment ability. Borrowers who qualify for such loans
generally would not qualify for loans conforming to Fannie Mae and Freddie
Mac underwriting guidelines as they generally have impaired credit
histories, which may include a record of major derogatory credit items
such as outstanding judgments or prior bankruptcies. On a case by
case basis, the originator may determine that, based upon compensating
factors, a prospective borrower not strictly qualifying under its
applicable underwriting risk category guidelines warrants an underwriting
exception. It is expected that a significant number of the mortgage
loans will have been originated based on such underwriting exceptions.
The underwriting standards do not prohibit a mortgagor from obtaining,
at the time of origination of the originator's first lien mortgage
loan, additional financing which is
subordinate to that first lien
mortgage loan, which subordinate financing would reduce the equity the
mortgagor would otherwise have in the related mortgaged property as
indicated in the loan-to-value ratio tables in this prospectus
supplement.

As a result of the originator's underwriting standards, the mortgage
loans in the mortgage pool are likely to experience rates of delinquency,
foreclosure and bankruptcy that are higher, and that may be
substantially higher, than those experienced by mortgage loans
underwritten in a more traditional manner.
Furthermore, changes in the values of mortgaged properties may have a
greater effect on the delinquency, foreclosure, bankruptcy and loss
experience of the mortgage loans in the mortgage pool than on
mortgage loans originated in a more traditional manner. No assurance can
be given that the values of the related mortgaged properties have
remained or will remain at the levels in effect on the dates of
origination of the related mortgage loans. See "The Mortgage Pool--
Underwriting Standards" in this prospectus supplement.

The Subordinate Certificates
Have a Greater Risk of Loss
than Senior Certificates and
Subordination May Not Be
Sufficient to Protect Senior
Certificates from Losses
.................... When certain classes of certificates
provide credit enhancement for other classes of
certificates this is sometimes referred to as
"subordination." The subordination feature is intended to
enhance the likelihood that senior certificateholders
will receive regular payments of interest and
principal. For purposes of this prospectus supplement,
"subordinate classes" means:
o with respect to the Class A Certificates, the
subordinate certificates;
o with respect to each class of certificates having
an "M" designation, (i) each other class of
certificates having an "M" designation and a higher
numerical designation than such class, if any, and (ii)
the Class B Certificates.

Credit enhancement in the form of subordination will be
provided for the more senior certificates, first, by the
right of the holders of the more senior certificates to
receive certain payments of principal and interest, as
applicable, prior to the more subordinate classes
and, second, by the allocation of realized losses to the
more subordinate classes. This form of credit
enhancement is provided by using collections on the
mortgage loans otherwise payable to the holders of the
more subordinate classes to pay amounts due on the more
senior classes. Excess cash flow and collections
otherwise payable to the more subordinate classes will
comprise the sole source of funds from which such credit
enhancement is provided to the more senior certificates.
Realized losses are allocated to the subordinate
certificates, beginning with the subordinate certificates
with the lowest payment priority, until the principal
balance of that subordinate class has been reduced to
zero. This means that realized losses on the mortgage
loans not covered by excess interest or any
overcollateralization will first be allocated to the Class
B Certificates until the principal balance of the
Class B Certificates has been reduced to zero. Subsequent
realized losses will be allocated to the next most
junior class of subordinate certificates, until the
principal balance of that class of subordinate certificates
has been reduced to zero. In addition, if the aggregate
certificate principal balance of the subordinate
certificates is reduced to zero as a result of the
allocation of realized losses, the pro rata share of
any additional realized losses will be allocated to the
Class A-1 and Class A-2 Certificates, on a pro rata
basis, in each case until the certificate principal
balance thereof is reduced to zero.


You should fully consider the risks of investing in a
subordinate certificate, including the risk that you
may not fully recover your initial investment as a result
of realized losses. In addition, investors in senior
certificates should consider the risk that the
subordination of the subordinate classes may not be

S-27

sufficient to protect these certificates from losses.

See "Description of the Certificates" in this
prospectus supplement.

S-l3

**Overcollateralization and Excess Interest May Not Be Sufficient to Protect Certificates from Losses on the Mortgage Loans**
the

The amount by which the sum of aggregate stated principal balance of the mortgage loans exceeds the aggregate certificate principal balance of the certificates is called "overcollateralization." The mortgage loans are expected to generate more interest than is needed to pay interest on the certificates because the weighted average interest rate on the mortgage loans is expected to be higher than the weighted average pass-through rate on the certificates. This "excess interest" will be used to make additional principal payments on the certificates to the extent described in this prospectus supplement. Overcollateralization is intended to provide limited protection to certificateholders by absorbing the certificates' share of losses from liquidated mortgage loans. However, we cannot assure you that enough excess interest will be generated on the mortgage loans to create or maintain or restore the required levels of overcollateralization.

The excess interest available on any distribution date will be affected by the actual amount of interest received, collected or recovered in respect of the mortgage loans during the preceding month. The amount of interest received, collected or recovered will be influenced by changes in the weighted average of the mortgage rates resulting from prepayments and liquidations of the mortgage loans as well as from adjustments of the mortgage rates on the mortgage loans. Because the amount of excess interest available may vary and because the pass-through rates on the certificates may increase, it may be necessary to apply all or a portion of the available interest to cover the interest requirements. As a result, available excess interest may be reduced. Furthermore, a disproportionately high rate of prepayments of high interest rate mortgage loans would have a negative effect on future excess interest.

**Difference Between Mortgage Rates and Adjustable Certificate Pass-Through May Reduce Excess Interest**

. The pass-through rate on each

adjustable rate certificates may adjust monthly and is generally based on one-month LIBOR. The mortgage rates on the mortgage loans generally adjust semi-annually based on six-month LIBOR or annually based on one-year LIBOR, each of which is referred to as a mortgage index, and are subject to a maximum mortgage rate. However, with respect to approximately 72.05% of the statistical calculation pool mortgage loans, by principal balance as of the statistical calculation date, the related interest rates are initially fixed for a period of one, two, three or five years after origination before they begin to adjust. Because each mortgage index may respond to different economic and market factors than one-month LIBOR and because in some instances the interest rate on a mortgage loan is fixed for a period of time, there is not necessarily a correlation between the interest rates on the mortgage loans and the pass-through rates of the adjustable rate certificates. For example, it is possible that the interest rates on certain of the mortgage loans may decline while the pass-through rates on the adjustable rate certificates are stable or rising. In addition, although it is possible that both the mortgage rates on the mortgage loans and certificate pass-through rates may decline or increase during the same period, because of the difference

between interest rate
adjustment periods and
pass-through rate adjustment
periods, mortgage rates on the
mortgage loans may decline or
increase more slowly

S-14

than the certificate pass-through rates.

Net Rate Cap Puts a Limit on the Pass-Through Rate of the Certificates ................................................ The absence of a correlation between movement in the mortgage rates and the certificate pass-through rates may reduce the interest payable on the adjustable rate certificates because of the imposition of a pass-through rate cap called the "net rate cap." In addition, prepayments of mortgage loans with relatively higher mortgage rates may also reduce the net rate cap and consequently reduce the pass-through rate for one or more classes of adjustable rate certificates. It is intended that the amount by which a certificateholder's interest payment has been reduced by operation of the net rate cap will be paid first from payments, if any, allocated to the issuing entity pursuant to the corridor contract administration agreement described in this prospectus supplement, and second from remaining excess cash flow (if any) as described in this prospectus supplement. However, we cannot assure you that such funds will be available, or sufficient, to make any such payments.

Payments from the corridor contract are dependent solely upon the performance of the corridor contract counterparty. Thus, payments of these amounts involve counterparty risk. The ratings assigned to the offered certificates do not address the likelihood of receipt of any payments received from the corridor contract or the payment of net rate carryover.

Prepayments on the Mortgage Loans Are Unpredictable and Could Adversely Affect Your Yield and Reinvestment..................................... No one can accurately predict the level of prepayments that the mortgage loans will experience. The prepayment experience of the mortgage loans may be affected by many factors, including:

o                               general economic conditions,

o                               the level of prevailing interest rates,

o                               the availability of alternative financing,

o                               the applicability of prepayment charges, and

o                               homeowner mobility.

Any mortgage loan may be prepaid in full or in part at any time; however, approximately 80.03% of the mortgage loans by principal balance of the mortgage loans in the statistical calculation pool provide for the payment by the borrower of a prepayment charge on certain prepayments during the period of time specified in the related mortgage note. In addition, substantially all of the mortgage loans contain due-on-sale provisions, and the master servicer intends to enforce those provisions unless doing so is not permitted by applicable law or the master servicer, in a manner consistent with reasonable commercial practice, permits the purchaser of the mortgaged property in question to assume the related mortgage loan.

See "The Mortgage Pool" and "Yield, Prepayment and Maturity Considerations" in this prospectus supplement and "Certain Legal Aspects of the Loans -- Due-on-Sale Clauses" in the prospectus for a description of

certain provisions of the mortgage loans that may affect their prepayment experience.

The weighted average lives of the offered certificates will be sensitive to the rate and timing of principal payments (including prepayments) on the mortgage loans, which may fluctuate significantly from time to time.

You should note that:

‣ generally, if you purchase your certificates at a discount and principal is repaid on the mortgage loans slower than you anticipate, then your yield may be lower than you anticipate,

‣ your yield will also be sensitive to:

1) the level of one-month LIBOR,

2) the timing of adjustment of the pass-through rate on your certificate as it relates to the interest rates on the mortgage loans and the level of the mortgage index, the timing of adjustment of the interest rates on those mortgage loans, and periodic and lifetime limits on those adjustments, and

3) other limitations on the pass-through rate of the certificates as described further in this prospectus supplement, and o

you bear the reinvestment risks resulting from a faster or slower rate of principal payments than you expect. See

"Yield, Prepayment and Maturity Considerations" in this prospectus supplement.

Your Yield Will Be Affected
by the Interest-Only Feature
of Some of the Mortgage
Loans ...................... Approximately 90.96% of the mortgage loans in the statistical calculation pool, by principal balance of the mortgage loans in the statistical calculation pool require monthly payments of only accrued interest for the first one, two, three, five or ten years after origination. During the interest only period, the borrower is not required to pay any principal on the borrower's loan, and therefore, less principal will be available for distribution to certificateholders than would be the case if the mortgage loans amortized as of their first payment dates. In addition, assuming that borrowers of interest only mortgage loans make only their required monthly payments, at the end of the interest only period, interest only mortgage loans will have larger outstanding principal balances than mortgage loans with the same mortgage rate and original principal balance that amortize as of their first payment date. Accordingly, interest only mortgage loans may have a

higher risk of default after
the interest only period due
to the increased monthly
payment necessary to amortize
fully the mortgage loan over
its remaining term to maturity.
Investors should consider the
fact that during its interest
only period, the monthly
payment on an interest only
loan with the same mortgage
rate and monthly payment as a
mortgage loan that is fully
amortizing as of its first
payment date would support a
higher principal balance than
that of the fully amortizing
mortgage loan. Accordingly,
during the interest only
period,

nterest only mortgage loans may be less likely to prepay since the perceived benefits from refinancing may be less than if the mortgage loans were fully amortizing. As the interest only period approaches its end, however, these mortgage loans may be more likely to be refinanced in order to avoid higher monthly payments necessary to amortize fully the mortgage loans.

nterest only mortgage loans also may involve a greater degree of risk because if the related mortgagor defaults its outstanding principal balance will be higher than for an amortizing mortgage loan.

Geographic Concentration of Mortgaged Properties in Certain States Increases the Impact that Events in Those States Could Have On The Certificates ............... The tables in Annex A related to the state distribution of the mortgaged properties for the mortgage loans in the statistical calculation pool set forth the geographic concentration of the mortgaged properties. Property in California is more susceptible than homes located in other parts of the country to certain types of uninsurable hazards, such as earthquakes, floods, mudslides and other natural disasters, and property in Florida and the southeastern portion of the United States is also more susceptible than homes located in other parts of the country to certain types of uninsurable hazards, such as hurricanes, floods and other natural disasters. In addition:

o   economic conditions in states with significant concentrations (which may or may not affect real property values) may affect the ability of borrowers to repay their loans,

o   declines in the residential real estate markets in

S-38

states with significant
concentrations may reduce
the values of properties
located in those states,
which would result in an
increase in the loan-to-
value ratios, and

o  any increase in the market
value of properties located in
states with significant
concentrations would reduce
the loan-to-value ratios and
could, therefore, make
alternative sources of
financing available to the
borrowers at lower interest
rates, which could result in
an increased rate of
prepayment of the mortgage
loans.

S-39

Hurricane Katrina May Pose
Special Risks ................................................
......................At the end of August 2005, Hurricane
Katrina caused catastrophic
damage to areas in the Gulf
Coast region of the United
States. The trust fund will not
include mortgage loans that
are secured by properties in
the states of Louisiana,
Mississippi and Alabama that
are located in a FEMA
Individual Assistance
designated area as a result of
Hurricane Katrina. However,
we cannot assure you that
there are no mortgage loans
secured by properties that
experienced material damage
from Hurricane Katrina in the
trust fund.

Countrywide Home Loans, Inc.
will represent and warrant
as of the closing date that
each mortgaged property is
free of material damage and in
good repair. In the event of a
breach of that representation
and warranty, Countrywide Home
Loans will be obligated to
repurchase or substitute for
the related mortgage loan. Any
such repurchase would have the
effect of increasing the rate
of principal payment on the
certificates. Any damage to a
mortgaged property that
secures a mortgage loan in the
trust fund occurring after the
closing date as a result of any
other casualty event will not
cause a breach of this
representation and warranty.
The full economic impact of
Hurricane Katrina is uncertain
but may affect the ability of
borrowers to make payments on
their mortgage loans.
Initial economic effects
appear to include:

o                    localized
areas of nearly complete
destruction of the
economic infrastructure
and cessation of economic
activity, regional
interruptions in travel
and transportation,
tourism and economic
activity generally, and

o                    nationwide
decreases    in    petroleum
availability    with    a
corresponding   increase   in
price.

o                    We have no
way to determine whether
other effects will arise, how
long any of these effects
may last, or how these
effects may impact the
performance of the mortgage
loans. Any impact of these

events on the performance of the mortgage loans may increase the amount of losses borne by the holders of the certificates or impact the weighted average lives of the certificates.

Inability to Replace Servicer Could Affect Collections and Recoveries on the Mortgage Loans ........................................ ........................... The structure of the servicing fee might affect the ability to find a replacement master servicer. Although the trustee is required to replace the master servicer if the master servicer is terminated or resigns, if the trustee is unwilling (including for example because the servicing fee is insufficient) or unable (including for example, because the trustee does not have the systems to service mortgage loans), it may be necessary to appoint a replacement master servicer. Because the servicing fee is structured as a percentage of the stated principal balance of each mortgage loan, it may be difficult to replace the servicer at a time when the balance of the mortgage loans has been significantly reduced because the fee may be insufficient to cover the costs associated with servicing the credit blemished mortgage loans and related REO properties remaining in the pool. The performance of the mortgage loans may be negatively impacted, beyond the expected transition period during a servicing transfer, if a replacement master

S-18

ervicer is not retained within a reasonable amount of time.

Rights of the NIM Insurer
Limit Your Control and NIM

```
                    Insurer Actions May
                    Negatively Effect
                    You ........................  If there is a NIM Insurer, pursuant
                                                     to
                                                  the pooling and servicing
                                                  agreement, unless the NIM
                                                  Insurer fails to make a
                                                  required payment under the
                                                  policy insuring the net
                                                  interest margin securities
                                                  and the failure is
                                                  continuing or the NIM Insurer
                                                  is the subject of a bankruptcy
                                                  proceeding, referred to as a
                                                  "NIM Insurer Default", the
                                                  NIM Insurer will be entitled
                                                  to exercise, among others,
                                                  the following rights without
                                                  the consent of holders of
                                                  the offered certificates, and
                                                  the holders of the offered
                                                  certificates may exercise
                                                  these rights only with the
                                                  prior written consent of the
                                                  NIM Insurer:
                                                  o the right to provide
                                                    notices of master servicer
                                                    defaults and the right to
                                                    direct the trustee to
                                                    terminate the rights and
                                                    obligations of the master
                                                    servicer under the pooling
                                                    and servicing agreement upon
                                                    a default by the master
                                                    servicer,

                                                  o the right to remove the
                                                    trustee or
                                                  any co-trustee or custodian
                                                  pursuant to the pooling and
                                                    servicing agreement, and

                                                  o the right to direct the
                                                    trustee to
                                                  make investigations and take
                                                  actions pursuant to the pooling and
                                                    servicing agreement.

                                                  In addition, unless a NIM
                                                  Insurer Default exists, the
                                                  NIM Insurer's consent will be
                                                  required before, among other
                                                  things,

                                                  o any removal of the master
                                                    servicer, any successor
                                                    servicer or the trustee,
                                                    any appointment of any co-
                                                    trustee,

                                                  o any otherwise permissible
                                                    waivers of prepayment
                                                    charges or extensions of due
                                                    dates for payment granted by
                                                    the master servicer with
                                                    respect to more than 5% of
                                                    the mortgage loans, or
```

S-43

o  any amendment to the
   pooling and servicing
   agreement.

Investors in the offered
certificates should note that:

o  the rights granted to
   the NIM Insurer are
   extensive,

o  the interests of the NIM
   Insurer may be inconsistent
   with, and adverse to, the
   interests of the holders
   of the offered
   certificates, and the NIM
   Insurer has no obligation
   or duty to consider the
   interests of the offered
   certificates in connection
   with the exercise or
   nonexercise of the NIM
   Insurer's rights,

o  the NIM Insurer's exercise
   of its rights and consents
   may negatively affect the
   offered certificates and the
   existence of the NIM
   Insurer's rights, whether or
   not exercised, may adversely
   affect the liquidity of the
   offered certificates,
   relative to other securities
   backed by comparable
   mortgage loans and with
   comparable payment
   priorities and ratings, and

to any insurance policy issued by the NIM Insurer will not cover, and will not benefit in any manner whatsoever, the offered certificates.

See "Rights of the NIM Insurer under Pooling and Servicing Agreement" in this prospectus supplement.

Some statements contained in or incorporated by reference in this prospectus supplement and the accompanying prospectus consist of forward-looking statements relating to future economic performance or projections and other financial items. These statements can be identified by the use of forward-looking words such as "may," "will," "should," "expects," "believes," "anticipates," "estimates," or other comparable words. Forward-looking statements are subject to a variety of risks and uncertainties that could cause actual results to differ from the projected result. Those risks and uncertainties include, among others, general economic and business conditions, regulatory initiatives and compliance with governmental regulations, customer preferences and various other matters, many of which are beyond our control. Because we cannot predict the future, what actually happens may be very different from what we predict in our forward-looking statements.

S-20

# THE MORTGAGE POOL

General

Set forth below and in Annex A hereto is certain statistical information based on scheduled principal balances as of January 1, 2006, which is the "Statistical Calculation Date," concerning a pool of mortgage loans that CWABS, Inc. (the "Depositor") believes is representative of the mortgage loans to be included in the issuing entity. This pool of mortgage loans is referred to as the "Statistical Calculation Pool," and the mortgage loans are referred to as the "Statistical Calculation Pool Mortgage Loans."

A detailed description (the "Detailed Description") of the pool of conventional, credit blemished mortgage loans (the "Mortgage Loans") to be included in the issuing entity on the Closing Date (the "Mortgage Pool") will be filed on Form 8-K with the SEC after the Closing Date. Additionally, in accordance with applicable securities laws, if there are material changes in material characteristics of the Mortgage Pool, the Depositor will file on Form 8-K with the SEC additional information related to those material changes. The Detailed Description will specify the aggregate of the Stated Principal Balances of the Mortgage Loans included in the Mortgage Pool as of the later of (x) January 1, 2006 and (y) the date of origination of each such Mortgage Loan (the "Cut-off Date"). The aggregate of the Stated Principal Balances of these Mortgage Loans is referred to as the "Cut-off Date Pool Principal Balance" and the Stated Principal Balance of any Mortgage Loan as of the Cut-off Date is referred to as the "Cut-off Date Principal Balance." The Detailed Description will include the information in the same categories that are presented in Annex A with respect to the Statistical Calculation Pool.

The Statistical Calculation Pool consists of approximately 2,443 Mortgage Loans. The aggregate Stated Principal Balance of the Mortgage Loans included in the Statistical Calculation Pool as of the Statistical Calculation Date is approximately $700,000,400 (the "Statistical Calculation Date Pool Principal Balance"). The Depositor believes that the information set forth in this prospectus supplement with respect to the Statistical Calculation Pool as presently constituted is representative of the characteristics of the Mortgage Loans as will be constituted on the Closing Date, although some characteristics of the Mortgage Loans in the Mortgage Pool will vary. See "-- The Statistical Calculation Pool" below. Unless otherwise indicated, information presented below expressed as a percentage (other than rates of interest) are approximate percentages based on the Statistical Calculation Date Pool Principal Balance.

All of the Mortgage Loans to be included in the issuing entity will be evidenced by promissory notes (the "Mortgage Notes"). The Mortgage Notes will be secured by first lien deeds of trust, security deeds or mortgages on one- to four-family residential properties (the "Mortgaged Properties"). The Mortgaged Properties in the Statistical Calculation Pool are located in 46 states and the District of Columbia.

The Mortgage Loans will provide for the full amortization of the amount financed over a series of monthly payments, and will provide for payments due on various days of each month. The Mortgage Loans to be included in the issuing entity will have been purchased by Countrywide Home Loans, Inc. ("Countrywide Home Loans" or a "Seller") from Impac Funding Corporation (the "Originator") and will have been originated generally in accordance with the underwriting criteria described in this prospectus supplement under "The Originator -- Underwriting Standards."

Scheduled monthly payments made by the mortgagors on the Mortgage Loans ("Scheduled Payments") either earlier or later than the scheduled due dates thereof will not affect the amortization schedule or the relative application of the payments to principal and interest. The Mortgage Notes generally will provide for a fifteen (15) day grace period for monthly payments. A Scheduled Payment with respect to a Mortgage Loan is generally considered "delinquent" if the mortgagor fails to make the Scheduled Payment prior to the due date occurring immediately after the due date on which the Scheduled Payment was originally due. None of the Mortgage Loans will be more than one payment delinquent on a contractual basis as of the Cut-off Date.

Any Mortgage Loan may be prepaid in full or in part at any time; however, approximately 80.03% of the Mortgage Loans in the Statistical Calculation Pool, by principal balance of the Mortgage Loans in the Statistical Calculation Pool, provide for the payment by the borrower of a prepayment charge on certain prepayments made with respect to the Mortgage Loans. Generally, a prepayment charge will apply to prepayments made within from

S-46

ix months to five years, depending on the terms of the Mortgage Loan, from the date of execution of the related Mortgage Note. In general, the elated Mortgage Note will provide that a prepayment charge will apply if, during the applicable period, the borrower prepays the Mortgage .oan in full. The amount of the prepayment charge will generally be equal to six months' advance interest calculated on the basis of the /lortgage Rate in effect at the time of the prepayment on the amount prepaid in excess of the percentage of the original balance of the /lortgage Loan specified in the related Mortgage Note, although the Mortgage Notes related to certain of the Mortgage Loans may provide for a ifferent method for calculating the prepayment charges. All prepayment charges will be allocated to the Class P Certificates as provided in the 'ooling and Servicing Agreement and will not be available for distributions on the Offered Certificates. The "Mortgage Rate" with respect to a /lortgage Loan is the annual rate of interest borne by the Mortgage Loan pursuant to the terms of the related Mortgage Note.

:ountrywide Home Loans will make all of the representations specified in the prospectus under "Loan Program -- Representations by Sellers; tepurchases" with respect to all of the Mortgage Loans. Each other Seller will be a special purpose entity established by Countrywide Financial :orporation or one of its subsidiaries and will sell mortgage loans that were previously acquired from Countrywide Home Loans. :onsequently, each Seller other than Countrywide Home Loans will only represent that immediately prior to the assignment of the Mortgage .oans to be sold by it to the Depositor, the Seller had good title to, and was the sole owner of, those Mortgage Loans free and clear of any ·ledge, lien, encumbrance or security interest and had full right and authority, subject to no interest or participation of, or agreement with, any ·ther party, to sell and assign the Mortgage Loans pursuant to the Pooling and Servicing Agreement. In addition, the Depositor will represent 1at following the transfer of the Mortgage Loans to it by the Sellers, the Depositor had good title to the Mortgage Loans and that each of the /lortgage Notes was subject to no offsets, claims, defenses or counterclaims.

:ach of the Mortgage Loans will have a Mortgage Rate which is subject to adjustment on the first day of the months specified in the related /lortgage Note, referred to as an "Adjustment Date"), to equal the sum, rounded to the nearest 0.125%, of:

l) (i) the average of the London interbank offered rates for six-month U.S. dollar deposits in the London market or (ii) the average of the .ondon interbank offered rates for one-year U.S. dollar deposits in the London market, each generally as set forth in either The Wall Street ournal or some other source generally accepted in the residential mortgage loan origination business and specified in the related Mortgage lote, or, if such rate ceases to be published in The Wall Street Journal or becomes unavailable for any reason, then based upon a new index elected by the Master Servicer based on comparable information, in each case, as most recently announced as of either 45 days prior to, or the irst business day of the month immediately preceding the month of, such Adjustment Date (the "Mortgage Index"), and

2) a fixed percentage amount specified in the related Mortgage Note (the "Gross Margin");

·rovided, however, that the Mortgage Rate for any Mortgage Loan will not increase or decrease on its initial Adjustment Date by more than a ertain specified percentage (the "Initial Periodic Rate Cap"), or on any subsequent Adjustment Date by more than a certain specified ·ercentage (the "Subsequent Periodic Rate Cap"). The Initial Periodic Rate Cap and Subsequent Periodic Rate Cap for any Mortgage Loan will be pecified in the related Mortgage Note. Substantially all of the Mortgage Loans will have been originated with Mortgage Rates less than the sum ·f the then-current Mortgage Index and the related Gross Margin. In addition, approximately 90.96% of the mortgage loans in the statistical alculation pool, by principal balance of the mortgage loans in the statistical calculation pool require monthly payments of only accrued interest or the first one, two, three, five or ten years after origination.

One-Year Hybrid Mortgage Loans", "Two-Year Hybrid Mortgage Loans", "Three-Year Hybrid Mortgage Loans" and "Five-Year Hybrid /lortgage Loans" (collectively, "Hybrid Mortgage Loans") have fixed Mortgage Rates for approximately 12, 24, 36 and 60 months, espectively, after their origination before the fixed Mortgage Rates become subject to adjustment based on the Mortgage Index described in 1e immediately preceding paragraph. Approximately 72.05% of all of the Mortgage Loans in the Statistical Calculation Pool are Hybrid /lortgage Loans.

Effective with the first payment due on an Mortgage Loan after each related Adjustment Date, the monthly payment will be adjusted to an amount which will fully amortize the outstanding principal balance of the Mortgage Loan over its remaining term.

Loan-to-Value Ratio. The "Loan-to-Value Ratio" of a Mortgage Loan is equal to:

1) the principal balance of the Mortgage Loan at the date of origination, divided by

2) the Collateral Value of the related Mortgaged Property.

The "Collateral Value" of a Mortgaged Property is the lesser of:

1) the appraised value based on an appraisal made at the time of the origination of the related Mortgage Loan, and

2) the sales price of the Mortgaged Property at the time of origination.

With respect to a Mortgage Loan the proceeds of which were used to refinance an existing mortgage loan, the Collateral Value is the appraised value of the Mortgaged Property based upon the appraisal obtained at the time of refinancing.

Stated Principal Balance. "Stated Principal Balance" means, for any Mortgage Loan and (1) the Cut-off Date, the unpaid principal balance of the Mortgage Loan as of the Cut-Off Date, as specified in its amortization schedule at the time (before any adjustment to the amortization schedule for any moratorium or similar waiver or grace period), after giving effect to any partial prepayments and Liquidation Proceeds received prior to the Cut-Off Date and to the payment of principal due on the Cut-Off Date and irrespective of any delinquency in payment by the related mortgagor or (2) any Distribution Date, the Stated Principal Balance of the Mortgage Loan as of its Cut-off Date, minus the sum of (i) the principal portion of any Scheduled Payments due with respect to the Mortgage Loan on or prior to the end of the most recent Due Period that were received by the Master Servicer on or prior to the most recent Determination Date or were advanced by the Master Servicer on or prior to the most recent Master Servicer Advance Date, (ii) principal prepayments with respect to the Mortgage Loan received on or prior to the end of the most recent prepayment period (the period from the 16th day of the month prior to a Distribution Date (or, in the case of the first Distribution Date, from the Cut-off Date) to and including the 15th day of the month in which the Distribution Date occurs (each a "Prepayment Period") and (iii) Liquidation Proceeds received by the Master Servicer prior to the end of the most recent Due Period to the extent applied as recoveries of principal with respect to the Mortgage Loan. The Stated Principal Balance of any Mortgage Loan as to which the related Mortgaged Property has been liquidated and as to which a Final Recovery Determination has been made will be zero on each date following the Due Period in which the Final Recovery Determination is made. When used with respect to the Mortgage Pool, Stated Principal Balance means the aggregate Stated Principal Balance of all Mortgage Loans in the Mortgage Pool. A "Determination Date" means with respect to any Distribution Date, the 15th day of the month of the Distribution Date or, if the 15th day is not a Business Day, the immediately preceding Business Day.

With respect to approximately 11.32% of the Mortgage Loans in the Statistical Calculation Pool, by principal balance of the Mortgage Loans in the Statistical Calculation Pool, the lender (rather than the borrower) acquired primary mortgage guaranty insurance and charged the related borrower an interest premium. The primary mortgage guaranty insurance policy will be maintained for the life of the lender acquired mortgage insurance Mortgage Loans, unless otherwise provided in the mortgage note or prohibited by law.

**The Statistical Calculation Pool**

The statistical information presented in this prospectus supplement is based on the Statistical Calculation Pool. The Statistical Calculation Pool reflects Mortgage Loans as of January 1, 2006. The statistical information presented in this prospectus supplement is based on the number and the Stated Principal Balances of the Mortgage Loans as of the Statistical Calculation Date. It is expected that additional Mortgage Loans will be included in the Mortgage Pool on the Closing Date and that certain of the Statistical Calculation Pool Mortgage Loans may prepay

n part or in full prior to the Closing Date, or may be determined not to meet the eligibility criteria requirements for the Mortgage Pool and therefore may not be included in the Mortgage Pool. As a result of the foregoing, the statistical distribution of characteristics for the Mortgage Pool will vary from the statistical distribution of the characteristics of the Statistical Calculation Pool as presented in this prospectus supplement, although the variance will not be material. Further statistical information regarding the Statistical Calculation Pool Mortgage Loans is set forth in Annex A hereto.

### Assignment of the Mortgage Loans

Pursuant to the pooling and servicing agreement dated as of January 1, 2006 (the "Pooling and Servicing Agreement"), among the Depositor, the Master Servicer, the Sellers, The Bank of New York, as trustee (the "Trustee"), the Depositor on the Closing Date will sell, transfer, assign, set over and otherwise convey without recourse to the Trustee in trust for the benefit of the certificateholders, all right, title and interest of the Depositor in and to each Mortgage Loan and all right, title and interest in and to all other assets included in the issuing entity, including all principal and interest received on or with respect to the Mortgage Loans after the Cut-off Date (exclusive of any scheduled principal due on or prior to the Cut-off Date and any interest accruing prior to the Cut-off Date).

In connection with the transfer and assignment of the Mortgage Loans, the Depositor will deliver the following documents to the Trustee (collectively constituting the "Trustee's Mortgage File") with respect to each Mortgage Loan:

1) the original Mortgage Note, endorsed by the applicable Seller or the originator of the Mortgage Loan, without recourse in the following form: "Pay to the order of _____ without recourse" with all intervening endorsements that show a complete chain of endorsement from the originator to the applicable Seller, except that the Depositor may deliver or cause to be delivered a lost note affidavit in lieu of any original Mortgage Note that has been lost,

2) the original recorded Mortgage or a copy of such instrument,

3) a duly executed assignment of the Mortgage to "Asset-Backed Certificates, Series 2006-IM1, CWABS, Inc., by The Bank of New York, as trustee under the Pooling and Servicing Agreement dated as of January 1, 2006, without recourse," in recordable form, as described in the Pooling and Servicing Agreement,

4) the original recorded assignment or assignments of the Mortgage together with all interim recorded assignments of the Mortgage or copies thereof, except for any documents not returned from the public recording office, which will be delivered to the Trustee as soon as the same is available to the Depositor,

5) the original or copies of each assumption, modification, written assurance or substitution agreement, if any, and

6) the original or duplicate original lender's title policy and all riders thereto or, in the event the original title policy has not been received from the insurer, the original or duplicate original lender's title policy and all riders thereto will be delivered within one year of the Closing Date.

Notwithstanding the foregoing, in lieu of providing the documents set forth in clauses (3) and (4) above, the Depositor may at its discretion provide evidence that the related Mortgage is held through the MERS(R) System. In addition, the Mortgages for some or all of the Mortgage Loans in the issuing entity that are not already held through the MERS(R) System may, at the discretion of the Master Servicer, in the future be held through the MERS(R) System. For any Mortgage held through the MERS(R) System, the Mortgage is recorded in the name of Mortgage Electronic Registration Systems, Inc., or MERS(R), as nominee for the owner of the Mortgage Loan, and subsequent assignments of the Mortgage were, or in the future may be, at the discretion of the Master Servicer, registered electronically through the MERS(R) System. For each of these Mortgage Loans, MERS(R) serves as mortgagee of

ecord on the Mortgage solely as a nominee in an administrative capacity on behalf of the Trustee, and does not have any interest in the Mortgage Loan.

Pursuant to the Pooling and Servicing Agreement, the Depositor will be required to deliver (or cause delivery of) the Trustee's Mortgage Files:

A) not later than the Closing Date, with respect to at least 50% of the Mortgage Loans,

B) not later than twenty days after the Closing Date, with respect to at least an additional 40% of the Mortgage Loans, and

C) not later than thirty days after the Closing Date, with respect to the remaining Mortgage Loans.

Assignments of the Mortgage Loans to the Trustee (or its nominee) will be recorded in the appropriate public office for real property records, except in states (such as California) as to which an opinion of counsel is delivered to the effect that the recording is not required to protect the Trustee's interests in the Mortgage Loan against the claim of any subsequent transferee or any successor to or creditor of the Depositor or the applicable Seller. As to any Mortgage Loan, the recording requirement exception described in the preceding sentence is applicable only so long as the related Trustee's Mortgage File is maintained in the possession of the Trustee in one of the states to which the exception applies. In the event an assignment is delivered to the Trustee in blank and the related Trustee's Mortgage File is released by the Trustee pursuant to applicable provisions of the Pooling and Servicing Agreement, the Trustee will complete the assignment as provided in subparagraph (3) above prior to the release. In the event recording the assignment of the Mortgage Loan is required to protect the interest of the Trustee in the Mortgage Loans, the Master Servicer is required to cause each previously unrecorded assignment to be submitted for recording.

The Trustee will review the Mortgage Loan documents on or prior to the Closing Date (or promptly after the Trustee's receipt of any document permitted to be delivered after the Closing Date) and the Trustee will hold the Mortgage Loan documents in trust for the benefit of the holders of the Certificates in accordance with its customary procedures, including storing the documents in fire-resistant facilities. After review of the Mortgage Loan documents, if any document is found to be missing or defective in any material respect, the Trustee is required to notify the Master Servicer and Countrywide Home Loans in writing. If Countrywide Home Loans cannot or does not cure the omission or defect within 90 days of its receipt of notice from the Trustee, Countrywide Home Loans is required to repurchase the related Mortgage Loan from the issuing entity at a price (the "Purchase Price") equal to the sum of:

i) 100% of the unpaid principal balance (or, if the purchase or repurchase, as the case may be, is effected by the Master Servicer, the Stated Principal Balance) of the Mortgage Loan as of the date of the purchase,

ii) accrued interest thereon at the applicable Mortgage Rate (or, if the purchase or repurchase, as the case may be, is effected by the Master Servicer, at the Net Mortgage Rate) from (a) the date through which interest was last paid by the mortgagor (or, if the purchase or repurchase, as the case may be, is effected by the Master Servicer, the date through which interest was last advanced by, and not reimbursed to, the Master Servicer) to (b) the Due Date in the month in which the Purchase Price is to be distributed to certificateholders, and

iii) any costs, expenses and damages incurred by the issuing entity resulting from any violation of any predatory or abusive lending law in connection with the Mortgage Loan.

Rather than repurchase the Mortgage Loan as provided above, Countrywide Home Loans may remove the Mortgage Loan (a "Deleted Mortgage Loan") from the issuing entity and substitute in its place another Mortgage Loan of like kind (a "Replacement Mortgage Loan"); however, a substitution is only permitted within two years after the Closing Date, and may not be made unless an opinion of counsel is provided to the effect that the

S-50

substitution would not disqualify any REMIC election made by the Trustee or result in a prohibited transaction tax under the Code. Any Replacement Mortgage Loan generally will, on the date of substitution, among other characteristics set forth in the Pooling and Servicing Agreement:

1)      have a Stated Principal Balance, after deduction of the principal portion of the Scheduled Payment due in the month of substitution, not in excess of, and not less than 90% of, the Stated Principal Balance of the Deleted Mortgage Loan (the amount of any shortfall to be forwarded by Countrywide Home Loans to the Master Servicer and deposited by the Master Servicer in the Certificate Account not later than the succeeding Determination Date and held for distribution to the holders of the Certificates on the related Distribution Date),

2)      have a Maximum Mortgage Rate specified in its related Mortgage Note (the "Maximum Mortgage Rate") not more than 1% per annum higher or lower than the Maximum Mortgage Rate of the Deleted Mortgage Loan,

3)      have a minimum Mortgage Rate specified in its related Mortgage Note (the "Minimum Mortgage Rate") not more than 1% per annum higher or lower than the Minimum Mortgage Rate of the Deleted Mortgage Loan,

4)      have the same Mortgage Index and intervals between Adjustment Dates as the Deleted Mortgage Loan, an Initial Periodic Rate Cap and a Subsequent Periodic Rate Cap each not more than 1% per annum lower than that of the Deleted Mortgage Loan, and a Gross Margin not more than 1% per annum higher or lower than that of the Deleted Mortgage Loan,

5)      have the same or higher credit quality characteristics than that of the Deleted Mortgage Loan,

6)      be accruing interest at a rate not more than 1% per annum higher or lower than that of the Deleted Mortgage Loan,

7)      have a Loan-to-Value Ratio no higher than that of the Deleted Mortgage Loan,

8)      have a remaining term to maturity not greater than (and not more than one year less than) that of the Deleted Mortgage Loan.

9)      not permit conversion of the Mortgage Rate from a variable rate to a fixed rate,

10)  provide for a prepayment charge on terms substantially similar to those of the prepayment charge, if any, of the Deleted Mortgage Loan,

11)  have the same occupancy type and lien priority as the Deleted Mortgage Loan, and

12)  comply with all of the representations and warranties set forth in the Pooling and Servicing Agreement as of the date of substitution.

This cure, repurchase or substitution obligation constitutes the sole remedy available to the certificateholders, the Trustee or the Depositor for omission of, or a material defect in, a Mortgage Loan document.

## THE ORIGINATOR

The Impac Funding Corporation, also referred to herein as the Originator, is a California corporation. The Originator is a wholly owned subsidiary of Impac Mortgage Holdings, Inc., a publicly traded company which trades on the New York Stock Exchange under the ticker symbol "IMH". The Originator is a mortgage company that acquires, purchases and sells primarily first-lien non-conforming Alt-A mortgage loans from a network of third party correspondents, mortgage bankers, and brokers. The Originator originated approximately $9.5 billion of

mortgage loans in 2003, $22.2 billion of mortgage loans in 2004, and $16.9 billion of mortgage loans during the first nine months of 2005. The Originator has been originating mortgage loans since 1995. The principal executive offices of the Originator are located at 1401 Dove Street, Newport Beach, California 92660.

The Originator is not aware of any legal proceeds pending against it or against any of its property, including any proceedings known to be contemplated by governmental authorities that are material to holders of the Certificates.

**Underwriting Standards**

**General**

Approximately 35.43% of the sample mortgage loans were underwritten pursuant to, or in accordance with, the standards of the Originator's Progressive Series Program which is described below. Approximately 3.28% of the sample mortgage loans were underwritten pursuant to, or in accordance with, the standards of the Progressive Express(TM) Program, each of which is described below. Approximately 61.30% of the sample mortgage loans were acquired by the Originator in bulk purchases from third-party originators, the underwriting standards of whom are generally similar to the underwriting standards of the Originator as described below.

**Details of Specific Programs**

The following provisions apply to all of the mortgage loans originated under the Originator's Progressive Series Program and Progressive Express(TM) Program.

*Eligibility.* The Originator generally performs a pre-funding audit on each mortgage loan. This audit includes a review for compliance with the related program parameters and accuracy of the legal documents.

*Variations.* The Originator uses the following parameters as guidelines only. On a case-by-case basis, the Originator may determine that the prospective mortgagor warrants an exception outside the standard program guidelines. An exception may be allowed if the loan application reflects certain compensating factors, including instances where the prospective mortgagor:

› has demonstrated an ability to save and devote a greater portion of income to basic housing needs;

› may have a potential for increased earnings and advancement because of education or special job training, even if the prospective mortgagor has just entered the job market;

› has demonstrated an ability to maintain a debt free position;

› may have short term income that is verifiable but could not be counted as stable income because it does not meet the remaining term requirements; and

› has net worth substantial enough to suggest that repayment of the loan is within the prospective mortgagor's ability.

*Appraisals.* The Originator does not publish an approved appraiser list for the conduit seller. Each conduit seller maintains its own list of appraisers, provided that each appraiser must:

› be a state licensed or certified appraiser;

› meet the independent appraiser requirements for staff appraisers, or, if appropriate, be on a list of appraisers specified by the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the FDIC and the Office of Thrift Supervision under their respective real estate appraisal regulations adopted in accordance with Title XI of the Financial Institutions Reform Recovery and Enforcement Act of 1989, regardless of whether the seller is subject to those regulations;

be experienced in the appraisal of properties similar to the type being appraised;

be actively engaged in appraisal work; and

subscribe to a code of ethics that is at least as strict as the code of the American Institute of Real Estate Appraisers or the Society of Real state Appraisers.

/ith respect to the Originator's Progressive Series Program or Progressive Express(TM) Program in general one full appraisal is required on ach loan. In addition, an automated valuation model, or AVM, or a quantitative appraisal report (Fannie Mae Form 2055), or a Hansen Pro, or ihanced desk review is obtained either (a) when the loan-to-value ratio is 90.01% to 95% or (b) when the property has multiple units and the »an-to-value ratio is greater than 80%, or (c) the loan is a Progressive Express(TM) No Doc Program and the loan-to-value ratio is 80.01% to 0%. In addition, a quantitative appraisal report (Fannie Mae Form 2055), or a Hansen Pro, or enhanced desk review is obtained when the loan a Progressive Express(TM) No Doc Program and the loan-to-value ratio is equal to or greater than 90.01%. An enhanced field review is also :quired when the loan-to-value ratio is equal to or greater than 95.01% or when the loan amount is above $500,000 or the property is located in ieorgia and the loan-to-value ratio is 70.01% and above. Generally, when the loan amount is greater than $750,000 but less than 1,500,000, a full appraisal with interior photos plus a Fannie Mae Form 2055 are required or when the loan amount is greater than $1,500,000, vo full appraisals with interior photos are required. At the underwriter's discretion, any one of the above appraisal reviews may be required 'hen program parameters do not require an appraisal review.

'he Progressive Series Program

ieneral. The underwriting guidelines utilized in the Progressive Series Program, as developed by the Originator, are intended to assess the orrower's ability and willingness to repay the mortgage loan obligation and to assess the adequacy of the mortgaged property as collateral for ie mortgage loan. The Progressive Series Program is designed to meet the needs of borrowers with excellent credit, as well as those whose redit has been adversely affected. The Progressive Series Program consists of seven mortgage loan programs. Each program has different :edit criteria, reserve requirements, qualifying ratios and loan-to-value ratio restrictions. Series I is designed for credit history and income :quirements typical of "A" credit borrowers. In the event a borrower does not fit the Series I criteria, the borrower's mortgage loan is placed ito either Series II, III, III+, IV, V or VI, depending on which series' mortgage loan parameters meets the borrower's unique credit profile. eries II, III, III+, IV, V or VI allow for less restrictive standards because of certain compensating or offsetting factors such as a lower loan-to-value itio, verified liquid assets, job stability, pride of ownership and, in the case of refinanced mortgage loans, length of time owning the mortgaged roperty. The philosophy of the Progressive Series Program is that no single borrower characteristic should automatically determine whether an pplication for a mortgage loan should be approved or disapproved. Lending decisions are based on a risk analysis assessment after the review of ie entire mortgage loan file. Each mortgage loan is individually underwritten with emphasis placed on the overall quality of the mortgage loan. The rogressive Series I, II, III, III+, IV, V and VI Program borrowers are required to have debt service-to-income ratios within the range of 45% to 0% calculated on the basis of monthly income and depending on the loan-to-value ratio of the mortgage loan.

Inder the Progressive Series Program, the Originator underwrites one- to four-family mortgage loans with loan-to-value ratios at origination of p to 100%, depending on, among other things, a borrower's credit history, repayment ability and debt service-to-income ratio, as well as the /pe and use of the mortgaged property. Second lien financing of the mortgaged properties may be provided by lenders other than the >riginator at origination; however, the combined loan-to-value ratio ("CLTV") generally may not exceed 100%. Generally, when the loan-to-value itio is 97.00% to 100.00%, second liens are ineligible. Mortgage loans with a loan-to-value ratio of up to 95.00% on owner-occupied mortgage roperties are allowed a CLTV of up to 100%. Generally, second home-owner-occupied and non-owner-occupied mortgage properties are llowed a maximum CLTV of up to 95%. Under the Originator's 80/20 program, which is available to Progressive Series I and II borrowers only, the >riginator may allow second lien financing at the same time as the origination of the first lien with CLTVs of up to 100%.

S-53

# Exhibit B

# SEC Asset Backed Securities

**SECURITIES AND EXCHANGE COMMISSION**

**17 CFR PARTS 210, 228, 229, 230, 232, 239, 240, 242, 245 and 249**

**[RELEASE NOS. 33-8518; 34-50905; File No. S7-21-04]**

**RIN 3235-AF74**

**ASSET-BACKED SECURITIES**

**AGENCY:**     Securities and Exchange Commission.

**ACTION:**     Final rule; request for comment.

**SUMMARY:** We are adopting new and amended rules and forms to address comprehensively the registration, disclosure and reporting requirements for asset-backed securities under the Securities Act of 1933 and the Securities Exchange Act of 1934. The final rules and forms accomplish the following: update and clarify the Securities Act registration requirements for asset-backed securities offerings, including expanding the types of asset-backed securities that may be offered in delayed primary offerings on Form S-3; consolidate and codify existing interpretive positions that allow modified Exchange Act reporting that is more tailored and relevant to asset-backed securities; provide tailored disclosure guidance and requirements for Securities Act and Exchange Act filings involving asset-backed securities; and streamline and codify existing interpretive positions that permit the use of written communications in a registered offering of asset-backed securities in addition to the statutory registration statement prospectus. We also request additional comment regarding the appropriate treatment of certain structured securities that do not meet our definition of "asset-backed security."

**DATES:** <u>Effective Date</u>: [insert date 60 days after publication in the Federal Register].

<u>Comment Date</u>: Comments regarding the request for comment in Section III.A.2.a. of this document and the Form 12b-25 "collection of information" requirement, within the meaning of

the Paperwork Reduction Act of 1995, should be received on or before [insert date 60 days after publication in the Federal Register].

Compliance Dates:  Any registered offering of asset-backed securities commencing with an initial bona fide offer after December 31, 2005, and the asset-backed securities that are the subject of that registered offering, must comply with the new rules and forms.  For any such offerings that rely on Securities Act Rule 415(a)(1)(x), Securities Act registration statements filed after August 31, 2005 related to such offerings must be pre-effectively or post-effectively amended, as applicable, to make the prospectus included in Part I of the registration statement compliant and to make any required undertakings or other changes for Part II of the registration statement.  For Securities Act registration statements that were filed on or before August 31, 2005, the prospectus and prospectus supplement, taken together, relating to such offerings that rely on Rule 415(a)(1)(x) must comply, provided, that, (1) the Securities Act registration statement will need to be post-effectively amended if any new undertakings are required to be made with respect to such offerings in Part II of the registration statement; and (2) the Securities Act registration statement will need to be post-effectively amended to make the prospectus included in Part I of the registration statement compliant, as well as to make changes, if any, to Part II of the registration statement with respect to any registered offering of asset-backed securities under such registration statement commencing with an initial bona fide offer after March 31, 2006.

**ADDRESSES:**  Comments may be submitted by any of the following methods:

Electronic Comments:

- Use the Commission's Internet comment form (http://www.sec.gov/rules/final.shtml); or

2

- Send an e-mail to rule-comments@sec.gov. Please include File Number S7-21-04 on the subject line; or

- Use the Federal eRulemaking Portal (http://www.regulations.gov). Follow the instructions for submitting comments.

Paper Comments:

- Send paper comments in triplicate to Jonathan G. Katz, Secretary, Securities and Exchange Commission, 450 Fifth Street, NW, Washington, DC 20549-0609.

All submissions should refer to File Number S7-21-04. This file number should be included on the subject line if e-mail is used. To help us process and review your comments more efficiently, please use only one method. The Commission will post all comments on the Commission's Internet Web site (http://www.sec.gov/rules/final.shtml). Comments are also available for public inspection and copying in the Commission's Public Reference Room, 450 Fifth Street, NW, Washington, DC 20549. All comments received will be posted without change; we do not edit personal identifying information from submissions. You should submit only information that you wish to make available publicly.

**FOR FURTHER INFORMATION CONTACT:** Jeffrey J. Minton, Special Counsel, or Jennifer G. Williams, Attorney-Advisor, at (202) 942-2910, in the Office of Rulemaking, Division of Corporation Finance, U.S. Securities and Exchange Commission, 450 Fifth Street, NW, Washington, DC 20549.

3

**SUPPLEMENTARY INFORMATION:** We are adopting: amendments to Rules 1-02, 2-01, 2-02 and 2-07[1] of Regulation S-X[2] under the Securities Act of 1933 (the "Securities Act");[3] amendments to Items 10, 308, 401 and 406[4] of Regulation S-B[5] under the Securities Act; amendments to Items 10, 202, 308, 401, 406, 501, 503, 512, 601 and 701[6] of Regulation S-K[7] under the Securities Act; a new subpart of Regulation S-K, the 1100 series ("Regulation AB");[8] amendments to Rules 411 and 434[9] under the Securities Act; new Rules 139a, 167, 190, 191 and 426[10] under the Securities Act; amendments to Rule 311[11] of Regulation S-T;[12] new Rule 312[13]

---

[1] 17 CFR 210.1-02; 17 CFR 210.2-01; 17 CFR 210.2-02; and 17 CFR 210.2-07.

[2] 17 CFR 210.1-01 et seq.

[3] 15 U.S.C. 77a et seq.

[4] 17 CFR 228.10; 17 CFR 228.308; 17 CFR 228.401; and 17 CFR 228.406.

[5] 17 CFR 228.10 et seq.

[6] 17 CFR 229.10; 17 CFR 229.202; 17 CFR 229.308; 17 CFR 229.401; 17 CFR 229.406; 17 CFR 229.501; 17 CFR 229.503; 17 CFR 229.512; 17 CFR 229.601; and 17 CFR 229.701.

[7] 17 CFR 229.10 et seq.

[8] 17 CFR 229.1100 through 1123.

[9] 17 CFR 230.411 and 17 CFR 230.434.

[10] 17 CFR 230.139a; 17 CFR 230.167; 17 CFR 230.190; 17 CFR 230.191; and 17 CFR 230.426.

[11] 17 CFR 232.311.

[12] 17 CFR 232.10 et seq.

[13] 17 CFR 232.312.

of Regulation S-T; amendments to Forms S-1, S-2, S-3, S-11, F-1, F-2 and F-3[14] under the

Securities Act; amendments to Rules 10A-3, 12b-2, 12b-15, 12b-25, 13a-10, 13a-11, 13a-13,

13a-14, 13a-15, 13a-16, 15c2-8, 15d-10, 15d-11, 15d-13, 15d-14, 15d-15 and 15d-16[15] under the

Securities Exchange Act of 1934 (the "Exchange Act");[16] new Rules 3a12-12, 3b-19, 13a-17,

13a-18, 15d-17, 15d-18, 15d-22 and 15d-23[17] under the Exchange Act; amendments to Rule

100[18] of Regulation M[19] under the Exchange Act; amendments to Rule 101[20] of Regulation

BTR[21] under the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act");[22] amendments to

Forms 20-F, 40-F, 8-K, 10-K, 10-KSB and 12b-25[23] under the Exchange Act; and new Form 10-

---

[14] 17 CFR 239.11; 17 CFR 239.12; 17 CFR 239.13; 17 CFR 239.18; 17 CFR 239.31; 17 CFR 239.32; and 17 CFR 239.33.

[15] 17 CFR 240.10A-3; 17 CFR 240.12b-2; 17 CFR 240.12b-15; 17 CFR 240.12b-25; 17 CFR 240.13a-10; 17 CFR 240.13a-11; 17 CFR 240.13a-13; 17 CFR 240.13a-14; 17 CFR 240.13a-15; 17 CFR 240.13a-16; 17 CFR 240.15c2-8; 17 CFR 240.15d-10; 17 CFR 240.15d-11; 17 CFR 240.15d-13; 17 CFR 240.15d-14; 17 CFR 240.15d-15; and 17 CFR 240.15d-16.

[16] 15 U.S.C. 78a et seq.

[17] 17 CFR 240.3a12-12; 17 CFR 240.3b-19; 17 CFR 240.13a-17; 17 CFR 240.13a-18; 17 CFR 240.15d-17; 17 CFR 240.15d-18; 17 CFR 240.15d-22; and 17 CFR 240.15d-23.

[18] 17 CFR 242.100.

[19] 17 CFR 242.100 through 105.

[20] 17 CFR 245.101.

[21] 17 CFR 245.101 through 104.

[22] 15 U.S.C. 7201 et seq.

[23] 17 CFR 249.220f; 17 CFR 249.240f; 17 CFR 249.308; 17 CFR 249.310; 17 CFR 249.310b; and 17 CFR 249.322.

D[24] under the Exchange Act.

## Table of Contents

I.      Overview
        A.      What are Asset-Backed Securities?
        B.      Securities Act Registration
        C.      Disclosure
        D.      Communications during the Offering Process
        E.      Ongoing Reporting under the Exchange Act
        F.      Other Miscellaneous Amendments

II.     Background and Development of ABS and Regulatory Treatment

III.    Discussion of the Amendments

        A.      Securities Act Registration
                1.      Current Requirements
                2.      Definition of Asset-Backed Security
                        a.      Approach and Supplemental Request for Comment for other Structured Securities
                        b.      Basic Definition
                        c.      Nature of the Issuing Entity
                        d.      Delinquent and Non-Performing Pool Assets
                        e.      Lease-Backed Securitizations and Residual Values
                        f.      Exceptions to the "Discrete" Requirement
                3.      Securities Act Registration Statements
                        a.      Form Types
                        b.      Presentation of Disclosure in Base Prospectuses and Prospectus Supplements
                        c.      Form S-3 Eligibility Requirements for ABS
                        d.      Determining the "Issuer" and Required Signatures
                4.      Foreign ABS
                5.      Exclusion from Exchange Act Rule 15c2-8(b) for Form S-3 ABS
                6.      Registration of Underlying Pool Assets
                        a.      Current Requirements
                        b.      When Registration Is Required
                        c.      Exceptions from Disclosure and Delivery Conditions and Form S-3 Eligibility Requirements
                7.      Market-Making Transactions

---

[24] 17 CFR 249.312.

B. Disclosure
    1. Regulation AB
    2. Forepart of Registration Statement and Prospectus
    3. Transaction Parties
        a. Sponsor
        b. Depositor
        c. Issuing Entity and Transfer of Asset Pool
        d. Servicers
        e. Trustees
        f. Originators
        g. Other Transaction Parties and Scope of Disclosure
    4. Static Pool Information
        a. Disclosure Required
        b. Method of Presentation
    5. Pool Assets
        a. Pool Composition
        b. Sources of Pool Cash Flow
        c. Changes to the Asset Pool
        d. Rights and Claims Regarding the Pool Assets
    6. Transaction Structure
    7. Significant Obligors
    8. Credit Enhancement and other Support
    9. Other Basic Disclosure Items
        a. Tax Matters
        b. Legal Proceedings
        c. Affiliations and Certain Relationships and Related Transactions
        d. Ratings
        e. Reports and Additional Information
    10. Alternatives to Present Third Party Financial Information
        a. Incorporation by Reference
        b. Reference Information

C. Communications during the Offering Process
    1. ABS Informational and Computational Material
        a. Current Requirements
        b. Exemptive Rule
        c. Definition of ABS Informational and Computational Material
        d. Conditions for Use
        e. Filing Requirements
    2. Research Reports
        a. Current Requirements
        b. ABS Research Report Safe Harbor
    3. Other Communications during the Offering Process

      D.      Ongoing Reporting under the Exchange Act
            1.      Current Requirements
            2.      Determining the "Issuer" and Operation of the Section 15(d) Reporting Obligation
            3.      Reporting on EDGAR
            4.      Distribution Reports on Form 10-D
                  a.      New Form 10-D and Deadline for Filing
                  b.      Signatures
                  c.      Content
            5.      Annual Reports on Form 10-K
            6.      Certifications under Section 302 of the Sarbanes-Oxley Act
            7.      Report on Assessment of Compliance with Servicing Criteria and Accountant's Attestation
                  a.      Background
                  b.      Our Proposal and Overview of Revised Approach
                  c.      Assessment and Attestation of Servicing Compliance
                  d.      Attestation Report on Assessment of Compliance
            8.      Current Reporting on Form 8-K
                  a.      Items Requiring Current Disclosure
                  b.      Clarifying Amendments to Existing Items
                  c.      New Items
                  d.      Safe Harbor and Eligibility to Use Form S-3
            9.      Other Exchange Act Reporting Amendments
                  a.      Exclusion from Form 10-Q
                  b.      Exemptions from Section 16
                  c.      Transition Reports

      E.      Other Miscellaneous Amendments

      F.      Transition Period

IV.    Paperwork Reduction Act
V.     Cost-Benefit Analysis
VI.    Consideration of Burden on Competition and Promotion of Efficiency, Competition and Capital Formation
VII.   Regulatory Flexibility Analysis Certification
VIII.  Statutory Authority and Text of Rule and Form Amendments

I.     **Overview**

      A.     **What are Asset-Backed Securities?**

On May 3, 2004, we issued proposals to address comprehensively the registration,

disclosure and reporting requirements for asset-backed securities, or ABS, under the Securities Act and the Exchange Act.[25]  We received over 50 comments in response to our proposals.[26]  Commenters expressed overall support for our proposals to establish a separate framework for the registration and reporting of asset-backed securities due to differences between asset-backed securities and other securities.[27]  The final rule and form amendments we adopt today have been revised, as discussed in this release, to incorporate a number of changes recommended by commenters.

Asset-backed securities are securities that are backed by a discrete pool of self-liquidating financial assets.  Asset-backed securitization is a financing technique in which financial assets, in many cases themselves less liquid, are pooled and converted into instruments

---

[25] See Release No. 33-8419 (May 3, 2004) [69 FR 26650] (the "Proposing Release").

[26] The public comments we received and a summary of the comments prepared by our staff (the "Comment Summary") are available for inspection in our Public Reference Room at 450 Fifth Street, NW, Washington, DC 20549 in File No. S7-21-04, or may be viewed at http://www.sec.gov/rules/proposed/s72104.shtml.

[27] See, e.g., Letters of AIG Credit Corp. ("AIG"); Allen & Overy ("A&O"); American Bar Association ("ABA"); American Financial Services Association ("AFSA"); American Institute of Certified Public Accountants ("AICPA"); American Bankers Association ("Am. Bankers"); American Society of Corporate Secretaries ("ASCS"); American Securitization Forum ("ASF"); Australian Securitisation Forum ("Aus. SF"); Joint letter of American Honda Finance Corporation, DaimlerChrysler Services North America LLC, Ford Motor Credit Company, General Motors Acceptance Corporation, and Navistar Financial Corporation ("Auto Group"); Bond Market Association ("BMA"); Bank of America Corporation ("BOA"); Capital One Financial Corporation ("Capital One"); CFA Institute ("CFAI"); Citigroup Global Markets, Inc. ("CGMI"); Citigroup Inc. ("Citigroup"); Commercial Mortgage Securities Association ("CMSA"); Ernst & Young LLP ("E&Y"); European Securisation Forum ("ESF"); Fidelity Management & Research Company ("FMR"); First Marblehead Corporation ("First Marblehead"); Financial Services Roundtable ("FSR"); Investment Company Institute ("ICI"); Jones Day; JPMorganChase & Co. ("JPMorganChase); Kutak Rock LLP ("Kutak"); Mortgage Bankers Association ("MBA"); MBNA Corporation ("MBNA"); Metropolitan Life Insurance Company ("MetLife"); Moody's Investors Service ("Moody's"); PriceWaterhouseCoopers LLP ("PWC"); Joint letter of Sallie Mae., Inc. and Nelnet, Inc. ("Sallie Mae"); State Street Global Advisors ("State Street"); Toyota Motor Credit Corporation ("TMCC"); UBS Securities LLC ("UBS"); U.S. Bank National Association ("US Bank"); and Wells Fargo Bank, National Association ("Wells Fargo").

that may be offered and sold in the capital markets.[28]   In a basic securitization structure, an

entity, often a financial institution and commonly known as a "sponsor," originates or otherwise

acquires a pool of financial assets, such as mortgage loans, either directly or through an affiliate.

It then sells the financial assets, again either directly or through an affiliate, to a specially

created investment vehicle that issues securities "backed" or supported by those financial assets,

which securities are "asset-backed securities."   Payment on the asset-backed securities depends

primarily on the cash flows generated by the assets in the underlying pool and other rights

designed to assure timely payment, such as liquidity facilities, guarantees or other features

generally known as credit enhancements.   The structure of asset-backed securities is intended,

among other things, to insulate ABS investors from the corporate credit risk of the sponsor that

originated or acquired the financial assets.

     The ABS market is fairly young and has rapidly become an important part of the U.S.

capital markets.   One source estimates that U.S. public non-agency ABS issuance grew from

$46.8 billion in 1990 to $416 billion in 2003.[29]   Another source estimates 2003 new issuance

closer to $800 billion.[30]   ABS issuance is on pace to exceed corporate debt issuance in 2004.[31]

---

[28] "Securitization" is a commonly used term to describe this financing technique, although other terms, such as "asset-backed financing," also are used.

[29] See Bank One Capital Markets, Inc., 2004 Structured Debt Yearbook.

[30] See Asset Securitization Report (pub. by Thomson Media Inc).   See also Asset-Backed Alert (pub. by Harrison Scott Publications).   The four primary asset classes currently securitized are residential mortgages, automobile receivables, credit card receivables and student loans, which represented approximately 52%, 19%, 16% and 9% of 2003 new issuance, respectively.

[31] See, e.g., Jennifer Hughes and David Wells, "Asset-Backed Bonds Hit Record," Financial Times, Nov. 11, 2004, at 17; Aaron Lucchetti, "Indebted Consumers Reshape the Bond Market – Betting on Americans' Ability To Pay Their Bills May Pose Risks If Interest Rates Move Higher," Wall St. J., Sep. 14, 2004, at C1; and Christine Richard,

While residential mortgages were the first financial assets to be securitized, non-mortgage related securitizations have grown to include many other types of financial assets, such as credit card receivables, auto loans and student loans.  Before the Proposing Release, the Commission had not previously addressed on a comprehensive basis the regulatory treatment of asset-backed securities under the Securities Act or the Exchange Act.

Asset-backed securities and ABS issuers differ from corporate securities and operating companies.  In offering ABS, there is generally no business or management to describe.  Instead, information about the transaction structure and the characteristics and quality of the asset pool and servicing is often what is most important to investors.  Many of the Commission's existing disclosure and reporting requirements, which are designed primarily for corporate issuers and their securities, do not elicit relevant information for most asset-backed securities transactions.  Over time, Commission staff, through no-action letters and the filing review process, have developed a framework to address the different nature of asset-backed securities while being cognizant of developments in market practice.

With a few exceptions, our proposals were designed to consolidate and codify current staff positions and industry practice.  After carefully evaluating the public comment received, we are adopting new rules and amendments to address the four primary regulatory areas affecting asset-backed securities that were the subject of the proposal:  Securities Act registration; disclosure; communications during the offering process; and ongoing reporting under the Exchange Act.

---

"US Asset-Backeds:  No Slowdown As Consumers Borrow," Dow Jones Capital Markets Report, Sep. 17, 2004.  See also The Bond Market Association, Bond Market Research Quarterly, November 2004.

11